### UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| ANDREA HIRST, MOLLY STOVER, and EMILY STROBLE SZE, on behalf of themselves and all others similarly situated, | ) ) ) ) | |
| | ) | Case No. 1:15-cv-02036 |
| Plaintiffs, | ) ) | Honorable Judge John J. Tharp, Jr. |
| v. | ) ) | Magistrate Judge Jeffrey T. Gilbert |
| SKYWEST, INC. and SKYWEST AIRLINES, INC., | ) ) ) | |
| Defendants. | ) ) | |

### DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO DISMISS PLAINTIFFS' AMENDED CLASS ACTION COMPLAINT

#### INTRODUCTION

Whether calculated under federal or Illinois law, SkyWest compensates its flight attendants well above the minimum wage. This Court needs to do nothing more than apply precedent and arithmetic to Plaintiffs' Complaint to determine that there are no viable causes of action.

Flight attendant pay contracts are layered and complex – and depending on the vagaries of weather, air traffic, passenger interruptions and security delays – a flight attendant's hourly rate of compensation can vary, but, for the most part, Plaintiffs easily earned double and sometimes triple the state or federal minimum wage. Plaintiffs have Ms. Hirst's complete pay history at their disposal and presumably selected the most gruesome example they could find of a disrupted flight schedule – that nevertheless had Ms. Hirst realizing at least $12.78 per hour.

There is no allegation or dispute that every Plaintiff easily earned minimum wage if calculated over the workweek, so Plaintiffs ask this Court to do what no other Court in the Seventh Circuit has ever done: change the minimum wage rate calculation from a weekly

average to an hour-by-hour rate calculation. But even if Plaintiffs' adventure were momentarily entertained (which it should not be), it would nonetheless quickly be preempted by a raft of federal airline regulations so pervasive "as to make reasonable the inference that Congress left no room for the states to supplement it." *Wisconsin Central, Ltd. v. Shannon*, 39 F.3d 751, 762 (7th Cir. 2008). Similarly, the Commerce Clause has turned away state law claims that sought to burden interstate commerce by applying wage and hour laws to airline employees, who often live in one state and are domiciled in another, as they fly over dozens of state jurisdictions every day. *See Fitz-Gerald v. SkyWest Airlines, Inc.,* 155 Cal. App. 4th 411, 419 (2007).

These defenses are not made in the abstract. Within the last ten years, state and federal courts have found that SkyWest is not subject to state wage and hour laws, based on the Commerce Clause as well as the Airline Deregulation Act ("ADA") and the Railway Labor Act ("RLA"). *See, e.g., Fitz-Gerald*, 155 Cal. App. 4th at 411; *Blackwell v. SkyWest Airlines, Inc.*, 2008 WL 5103195 (S.D. Cal. Dec. 3, 2008). The ADA prevents the imposition of state wage laws that impact air carrier's rates, routes, and/or services, and the RLA (amended in 1936 to include airlines) preempts wage claims that require interpretation of a collective bargaining agreement. Directly on point, the *Fitz-Gerald* court refused to adopt the same hour-by-hour minimum wage theory advanced here and found that SkyWest flight attendants are covered by a collective bargaining agreement. As shown more fully below, because there is no basis in law for Plaintiffs' theories, the Complaint must be dismissed in its entirety.

## STATEMENT OF RELEVANT FACTS[1]

### SkyWest's Operations

SkyWest is a regional air carrier headquartered in St. George, Utah. Since 1997, SkyWest has partnered with various mainline carriers, including Delta, American, US Air, Alaska and United Airlines. SkyWest provides approximately 1,800 daily flights system-wide to 189 cities in 43 states, eleven cities in Mexico and six Canadian provinces. (Exhibit 1, Declaration of Sonya Wolford ("Wolford Dec.") at ¶¶ 2-3, and Wolford Dec. Ex. A.)

### SkyWest's Flight Attendants Are Represented By SIA And Their Terms And Conditions Of Employment Are Set forth In A Collective Bargaining Agreement.

The SkyWest InFlight Association ("SIA") is the exclusive, designated bargaining representative of the SkyWest flight attendants under Section 151, Sixth of the RLA. As such, SIA is responsible for negotiating with SkyWest management regarding the terms and conditions of employment, including wages, work hours, benefits and other compensation for all SkyWest flight attendants. (Exhibit 2, Declaration of Jenny Nicolay ("Nicolay Dec." at ¶¶ 3-4.) SkyWest does not negotiate with anyone other than SIA regarding the terms and conditions of the flight attendants' employment, including any individual. (*Id.* at ¶ 4.) SIA has acted in this capacity as the flight attendants' representative with SkyWest management since 1994. (*Id.*) SIA's by-laws specifically recognize it as "the true and only representative body of the Sky West InFlight group." (*Id.* at ¶¶ 3-4, and Dec. Ex. A.) Representatives of SkyWest and SIA meet, in person, to discuss, negotiate, and finalize the terms of a labor agreement, the Flight Attendant Policy

---

[1] The Declarations submitted herewith are submitted solely in support of the preemption arguments set forth in Section II of the Argument. The Court may consider matters outside of the Complaint in ruling on a motion to dismiss for lack of subject-matter jurisdiction. *See United Transp. Union v. Gateway Western Ry. Co.,* 78 F.3d 1208, 1210 (7th Cir. 1996). For purposes of the 12(b)(6) failure to state a claim arguments set forth in Section I, SkyWest assumes for purposes of this motion only that the facts asserted in the Complaint are true. In addition, SkyWest relies on the Agreement, which is referenced in, and attached to, the Complaint. This Court may consider documents referenced in the Complaint and relied upon by the parties whose authenticity is not disputed. *See Minch v. City of Chicago,* 486 F.3d 294, 300 n. 3 (7th Cir. 2007).

Manual ("Agreement"). SIA and SkyWest have successfully negotiated in this fashion for the last twenty-five years. (*Id.* at ¶¶ 5-6, and Doc. No. 22-2.) After bargaining, SIA members vote on and approve or reject the Agreement. (*Id.* at ¶ 6.)

### Flight Attendants' Work Schedules And Compensation Are Determined Under The Agreement.

Depending upon an individual's schedule, a flight attendant's compensation package may consist of various types of pay, including flight pay, per diem pay, training pay, reserve pay, monthly pay guarantees, training guarantees, reserve guarantees, shift cancellation pay, "deadhead" pay, "functional flight pay," vacation pay, user pay and/or holiday pay. (Wolford Dec. at ¶¶ 10-12; Doc. No. 22-2, Sec. 2308, 2309, 2310, 2317, 2327, 2328.) While the compensation system is complicated, it conforms to industry norms as it contemplates and compensates the flight attendants for all duties they perform. (Wolford Dec. at ¶¶ 10-13.)

### APPLICABLE LEGAL STANDARD

SkyWest brings this Motion under both Rules 12(b)(6) (Section I) and 12(b)(1) (Sections II and III). Rule 12(b)(6) requires dismissal where a complaint fails to state a claim upon which relief can be granted. FED. R. CIV. P. 12(b)(6). To survive, a complaint must contain "enough facts to state a claim for relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A complaint must "plead[] factual content that allows the court to draw the reasonable inference that defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). To avoid dismissal, the complaint must raise the possibility that the plaintiff has a right to relief above "a speculative level." *EEOC v. Concentra Health Care Services, Inc.*, 496 F.3d 773, 776 (7th Cir. 2007).

Rule 12(b)(1) provides for dismissal for lack of subject matter jurisdiction. FED. R. CIV. P. 12(b)(1); *Retired Chicago Police Ass'n v. City of Chicago,* 76 F.3d 856, 862 (7th Cir. 1996).

To survive a Rule 12(b)(1) motion to dismiss, the plaintiff bears the burden of proving the jurisdictional requirements have been met. *United Phosphorus, Ltd. v. Angus Chem. Co.,* 322 F.3d 942, 946 (7th Cir. 2003). "Fundamental to our law is the understanding that '[f]ederal courts are not courts of general jurisdiction; they have only the power that is authorized by Article III of the Constitution and the statutes enacted by Congress pursuant thereto.'" *Transit Express, Inc. v. Ettinger,* 246 F.3d 1018, 1023 (7th Cir. 2001) (quoting *Bender v. Williamsport Area School Dist.,* 475 U.S. 534, 541 (1986)).

**ARGUMENT**

## I. THE COMPLAINT FAILS TO STATE A VIABLE CAUSE OF ACTION.

### A. Minimum Wage Is Properly Calculated On A Weekly Average.

Plaintiffs' Complaint fails to state a minimum wage violation because their theory is predicated on the wrong formula. They mistakenly calculate the minimum wage on an hour-by-hour basis. For example, the Complaint singles out the week of October 30, 2012, and claims that Ms. Hirst only earned the minimum wage (or better) during 19 hours and 10 minutes of her 33 hour and 44 minute workweek based on their hour-by-hour formula. (Compl., Figure 1, ¶ 29.)

But the wage calculation rules are clear and well-established, at both the state and federal level. The FLSA provides "[e]very employer shall pay to each of his employees who in any workweek … not less than $7.25 an hour." 29 U.S.C. § 206a. Similarly, the IMWL provides that "… every employer shall pay to each of his or her employees … wages of not less than $8.25 per hour." 820 ILCS 105/4. While the Seventh Circuit has not decided the issue, every court within the Circuit to interpret these statutes has held that a minimum wage claim under both the FLSA and the IMWL is determined by analyzing whether the average hourly wage for the *workweek* – that is, the sum of all compensation divided by all hours worked – falls below

5

the minimum wage. *See, e.g., O'Brien v. Encotech Const.*, 2004 WL 609798, at *6-7 (N.D. Ill. Mar. 23, 2004) (dismissing FLSA and IMWL claims where no evidence that any plaintiff received pay for a workweek that averaged below the minimum wage); *Jones v. C & D Technologies*, 8 F.Supp.3d 1054, 1070 (S.D. Ind. 2014) (holding that plaintiffs asserting FLSA minimum wage claim can recover only "to the extent that the average hourly rate for time worked during the relevant time period falls below the minimum wage"); *Nicholson v. UTI Worldwide, Inc.*, 2010 WL 551551 at *4 (S.D. Ill. 2010) ("[g]enerally minimum wage laws like the IMWL have been construed to apply to the work week unit. That means that as long as an employee's total weekly wage is equal to or greater than his hours worked multiplied by the minimum hourly rate, the employer has satisfied the minimum wage requirement"); *Morgan v. SpeakEasy, LLC,* 625 F. Supp. 2d 632, 651 (N.D. Ill. 2007) (holding under both the FLSA and IMWL, the "minimum wage is to be calculated on a workweek basis"); *see also DeSaint, et. al. v. Delta Air Lines, Inc.*, 2015 WL 1888242 (D. Mass. Apr. 15, 2015) (rejecting hour-by-hour analysis under Massachusetts law).

Consistent with these cases, this weekly "averaging" approach has been adopted by the U.S. Department of Labor. 29 C.F.R. § 778.105. In addition, every Circuit Court to decide the issue has likewise held that an FLSA minimum wage claim is determined by analyzing whether the average hourly wage for the *workweek* falls below the minimum wage. *See Adair v. City of Kirkland*, 185 F.3d 1055, 1063 (9th Cir. 1999) ("the district court properly rejected any minimum wage claim the officers might have brought by finding their salary, when averaged across their total time worked, still paid them above the minimum wage."); *Hensley v. MacMillan Bloedel Containers, Inc.,* 786 F.2d 353, 357 (8th Cir. 1986) (any FLSA minimum wage violation is determined by average weekly wage, not hour per hour); *Dove v. Coupe*, 759

F.2d 167, 171-72 (D.C. Cir. 1985) (citing Department of Labor opinion setting workweek standard for minimum wage and collecting cases applying this standard); *Blankenship v. Thurston Motor Lines,* 415 F.2d 1193, 1197–98 (4th Cir. 1969) (same).

Ms. Hirst's flight pay in 2012 was $22.49 per hour. (Doc. No. 22-2, Sec. 2327.) As applied to the example offered in Figure 1 of the Complaint, Ms. Hirst earned $431.04 for the 19 hours and 10 minutes of flight time for the October 30 workweek.[2] When that amount is divided by the 33 hours and 44 minutes Ms. Hirst claims she worked, her average weekly rate was $12.78 per hour, well above state and federal minimum wage.[3] Plaintiffs do not allege that they earned less than the minimum wage in any workweek using an average weekly basis method. (Compl. ¶ 29.)

Because Plaintiffs do not allege that their weekly pay divided by their weekly hours worked was ever less than the federal or Illinois minimum wage, they have failed to state a claim upon which relief can be granted. Accordingly, Plaintiffs' FSLA and IMWL claims must be dismissed.

**B.     The IMWL Does Not Apply To Plaintiffs' Work Outside Of Illinois**.

Plaintiffs' Complaint details a trip that began and ended in Minneapolis, Minnesota (MSP), with stops in North Dakota, Wisconsin, Nebraska, Tennessee, and Ohio, as well as Canada. (Compl., Figure 1.) Curiously absent from this trip, and the Complaint in general, is work performed in the State of Illinois. While Plaintiffs allege they were based out of O'Hare

---

[2]     For the sake of simplicity, we do not include the additional taxable per diem compensation Ms. Hirst continually received, even while off duty, during this trip.

[3]     The example set forth later in Figure 3 of Plaintiffs' Complaint does no better. Figure 3 (Compl. ¶ 98) contains an example where Ms. Hirst has a total of 37.865 hours of duty time in a workweek. That same example sets forth 23.137 hours of block time that week. Even applying Ms. Hirst's old 2012 rate of $22.49 per hour (which went up by 2014), her compensation still far exceeds the minimum wage. Indeed, 23.137 hours times $22.49 per hour equals $520.35. $520.35 divided by the 37.865 hours of duty time yields a wage of $13.74 per hour, far in excess of the minimum wage.

Airport, and lived in Illinois (*See* Compl. ¶¶ 8-29, 98-99, 103-104 and Figures 1 and 3), these facts alone do not give rise to a claim under the IMWL.

It is axiomatic that Illinois statutes apply only to conduct within Illinois unless the statutory language expressly provides for out-of-state application. *See, e.g.*, *Avery v. State Farm Mut. Auto. Ins. Co.,* 216 Ill. 2d 100, 184–85 (2005) (holding the Illinois Consumer Fraud and Deceptive Business Practices Act did not apply out-of-state because a statute has no extraterritorial effect unless explicitly stated). The IMWL states that it applies only to "places of employment in the State of Illinois"; it does not apply to work performed extraterritorially. *Wooley v. Bridgeview Bank Mtg. Co. LLC*, 2015 WL 327357, at *2 (N.D. Ill. Jan. 23, 2015) (quoting 820 ILCS 105/2).

For these reasons, the *Wooley* court held that the IMWL did not apply to employees who worked in Kansas, despite the employer's Illinois location. *Id.* at *3. Similarly, in *Glass v. Kemper Corp.*, 133 F.3d 999, 1000 (7th Cir. 1998), the Seventh Circuit held that the Illinois Wage Payment and Collection Act did not apply where the plaintiff did not perform the work in Illinois. *See also Garcia v. Am. Airlines, Inc.*, 12 F.3d 308, 313 (1st Cir. 1993) (holding flight attendants, who performed more than 50% of their work elsewhere, are excluded from coverage under state wage and hour laws because the "job situs" is the fundamental consideration); *Sarviss v. Gen. Dynamics Info. Tech., Inc.*, 653 F. Supp. 2d 883, 900 (C.D. Cal. 2009) (holding California wage law did not apply to pilot who performed majority of work outside of California).

Here, the only connection to Illinois is Plaintiffs' residence and the fact that, on some trips, they may have begun or ended a trip at O'Hare. [4]  The crux of Plaintiffs' claims is that SkyWest allegedly did not pay them pursuant to the IMWL for time they were working out-of-state, after departing from O'Hare and before returning to O'Hare.  Under *Wooley* and the plain language of the IMWL, the IMWL does not apply to Plaintiffs' out-of-state work between or during flights because it did not occur in Illinois.  Indeed, there is no allegation that plaintiffs worked a single hour in Illinois, much less the 40 hours required to qualify for overtime.[5]  For this reason, Plaintiffs cannot state a viable claim for relief under the IMWL.

## II.    THE COURT LACKS SUBJECT MATTER JURISDICTION OVER PLAINTIFFS' CLAIMS.

### A.    Congress' Regulation Of The Airline Industry Is So Extensive That Field Preemption Bars Plaintiffs' Claims Under The IMWL.

Recognizing the vital role that the airline industry serves to interstate travel, and to our national economy, Congress has regulated nearly every facet of the airline industry.  Indeed, Congress' reach over the airline industry is so broad, and the federal interest so dominant, that it is reasonable to infer that Congress intended to "preempt the field," and thereby disallow supplemental state laws in the area of wages and working conditions.

The preemption doctrine is grounded in the Constitution's Supremacy Clause, which provides that it, "and the Laws of the United States … shall be the Supreme Law of the land."

---

[4]     Figure 3 of the Complaint likewise shows very little work performed in Illinois.  For example, Figure 3 details 4 days of work, from December 21, 2014 to December 24, 2014.  During that time, Ms. Hirst started at O'Hare (ORD), and flew to Austin, Texas (AUS).  She then flew to San Francisco, California (SFO) where she had a layover.  The following day, she flew from San Francisco to Kansas City, Missouri (MCI) and then back to San Francisco.  The next day, she flew from San Francisco to St. Louis, Missouri (STL).  And, lastly, on December 24, 2014, she flew from St. Louis to O'Hare, then to Atlanta, Georgia (ATL) and back to O'Hare.  This example, which Plaintiffs themselves chose, likewise demonstrates what little connection to Illinois this case has.

[5]     Notably, in discussing the Illinois Wage Payment and Collection Act, the Illinois Department of Labor notes that work must be performed in Illinois for the Illinois wage statutes to apply.  *See* https://www.illinois.gov/idol/FAQs/Pages/wage-payment-faq.aspx ("The work must be performed in Illinois for an employee to make a claim under the Act.  For example, a truck driver that lives in Illinois but travels throughout the United States to perform their work is likely not covered by the Act.") (last visited July 9, 2015).

U.S. Const. art. VI, cl. 2. "Field preemption" does not rest on an express congressional provision or a conflict between federal and state law, but instead occurs "if federal law so thoroughly occupies a legislative field 'as to make reasonable the inference that Congress left no room for the States to supplement it.'" *Wisconsin Central Ltd.*, 39 F.3d at 762 (holding IMWL preempted by federal railway legislation).

*Wisconsin Central* is instructive. There, the Seventh Circuit concluded that "Illinois' overtime regulations, as applied to interstate railways, are preempted." *Id.* at 765. The Seventh Circuit concluded as a matter of law that state overtime laws were preempted because "federal law so thoroughly occupies [the] legislative field 'as to make reasonable the inference that Congress left no room for the States to supplement it.'" *Id.* at 762 (quoting *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 516 (1992)). In doing so, the Seventh Circuit relied upon the "long history of pervasive congressional regulation over the railway industry." *Id.*

As in *Wisconsin Central*, Plaintiffs' claims here are preempted. Like America's rail system, the nation's air carriers have traditionally been heavily regulated by Congress:

> Congress has recognized the national responsibility for regulating air commerce. Federal control is intensive and exclusive. Planes do not wander about in the sky like vagrant clouds. They move only by federal permission, subject to federal inspection, in the hands of federally certified personnel and under an intricate system of federal commands. The moment a ship taxis onto a runway it is caught up in an elaborate and detailed system of controls. It takes off only by instruction from the control tower, it travels on prescribed beams, it may be diverted from its intended landing, and it obeys signals and orders. Its privileges, rights and protection, so far as transit is concerned, it owes to the Federal Government alone and not any state government.

*Northwest Airlines v. Minnesota*, 322 U.S. 292, 303 (1944) (Jackson, J., concurring). If the regulations in 1944 impressed the Supreme Court, imagine what the past 70 years have wrought. The Federal Aviation Administration ("FAA") was created in 1958 and heavily regulates all

aspects of the airline industry, including airline and aircraft certification, the air traffic system, airport operations, flight operations, safety and work conditions. *See* 49 U.S.C. §§ 44701 *et seq.* For flight attendants in particular, there is a labyrinth of Federal Air Regulations concerning maximum work hours, rest periods, job functions and qualifications, criminal background checks and initial and recurrent training requirements. *See, e.g.*, 14 C.F.R. § 1 *et seq.* The Transportation Security Administration was established in 2001 and regulates, among other things, how flight attendants perform security duties, how they access the aircraft, and how they move through secure areas of airports. *See, e.g.*, 49 C.F.R. § 1500.1 *et seq.* And, most relevant to the instant case, airline labor relations are extensively regulated by the RLA, 45 U.S.C. § 151, *et seq.*

This extensive framework of federal legislation demonstrates Congress' intent to occupy the field and, as readily concluded by the Seventh Circuit in the context of the nation's railway system, any state that seeks to impose wage or working condition regulations on the industry is preempted from doing so. Thus, Plaintiffs' claims should be dismissed.

**B.    Application Of The IMWL Violates The Commerce Clause Of The United States Constitution.**

It is hard to imagine an industry more deeply engaged in interstate commerce than the airline business. Flight attendants literally move in interstate commerce, as they regularly pass through dozens of states each day. If changing mud flaps at the state line was an impermissible burden on interstate commerce,[6] imagine the Kafkaesque encumbrance of applying 50 unique wage and hour regimes to employees who daily move through multiple states' airspace, sometimes for only a few minutes.

---

[6] *See* Illinois' famous *Bibb v. Navajo Freight Lines, Inc.*, 359 U.S. 520 (1959), known to 1Ls everywhere, which held that the law requiring trucks to have unique mudguards was unconstitutional under the Commerce Clause.

The Commerce Clause grants Congress the power to "regulate Commerce with foreign Nations, and among the several States." U.S. Const. art. I, § 8, cl. 3. The Commerce Clause not only confers power on the federal government, "it is also a substantive 'restriction on permissible state regulation' of interstate commerce" and operates as a self-executing limitation on the power of the states to enact laws that burden interstate commerce. *Dennis v. Higgins*, 498 U.S. 439, 447 (1991) (citation omitted); *New Energy Co. of Ind. v. Limbach*, 486 U.S. 269, 273 (1988). The test for determining whether the application of a state law violates the Commerce Clause balances the burdens on commerce against the interests of the state – even the application of the statute that imposes an "incidental" burden on commerce will be struck down if the burden outweighs the "putative local benefits." *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970).

Requiring a national airline to comply with Illinois' wage and hour laws, depending on the residence of the persons flying in the plane and/or the states in which they are operating, imposes precisely the type of burden on interstate commerce that the Commerce Clause was intended to prevent.

In *Fitz-Gerald*, the California Court of Appeals addressed this precise issue, concluding that the application of California's wage and hour laws to SkyWest flight attendants unduly burdened interstate commerce. 155 Cal. App. 4th at 419. In affirming the trial court, the California appellate court relied upon the U.S. Supreme Court's opinion in *Machinists Assn. v. Central Airlines* 372 U.S. 682, 687 (1963), noting:

> Congress has long concerned itself with minimizing interruptions in the Nation's transportation services by strikes and labor disputes and has made successive attempts to establish effective machinery to resolve disputes not only as to wages, hours, and working conditions, the so-called major disputes connected with a negotiation of contracts or alterations in them, but also as to the interpretation and application of existing contracts....

*Id.*

SkyWest (or any airline for that matter) could never function as a large multi-state airline if it is required to apply different compensation rules depending on whether or how much time one of its flight attendants happens to penetrate Illinois' (or any other state's) air space. The complexities and inequities associated with such a system, even if it could be designed, are mind-boggling. This is precisely the burden the Commerce Clause is designed to avoid.

**C.    The Airline Deregulation Act Preempts Plaintiffs' Claim Under The IMWL Because Plaintiffs' Hour-By-Hour Theory Would Affect SkyWest's Rates, Routes And Services.**

Prior to 1978, the federal government heavily regulated the airline industry through the Federal Aviation Act. *See generally* 49 U.S.C. § 40101, *et seq.* State regulation was allowed to coexist with federal regulation because of the Act's "savings" clause. 49 U.S.C. § 40120(c). However, "[i]n 1978, Congress, determining that 'maximum reliance on competitive market forces' would best further 'efficiency, innovation, and low prices' as well as 'variety [and] quality ... of air transportation services,' enacted the Airline Deregulation Act." *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 384-85 (1992). To prevent state regulation from interfering with federal deregulation, the ADA included a preemption provision, prohibiting the States from enforcing any law "relating to rates, routes, or services" of any air carrier. *Id.*; 49 U.S.C. § 1305(a)(1).

The Supreme Court has consistently recognized that the ADA's preemption provision is broad in scope. *Rowe v. N.H. Motor Transp. Ass'n*, 552 U.S. 364, 370-71 (2008). As recognized in *Rowe*, ADA preemption applies even if the state law's effect on rates, routes, or services is "only indirect." *Morales*, 504 U.S. at 384-85. The preemption analysis focuses on the *effect* of the state law on airlines' services and rates – not the purpose of the state law or the type of plaintiff. *Morales*, 504 U.S. at 385; *see Giannopoulos v. Iberia Lineas Aereas de Espana, S.A.*, 17 F. Supp. 3d 743, 751 (N.D. Ill. 2014) ("there can be no question that the [ADA]

is so pervasive . . . that it may be inferred that Congress intended to occupy the entire legislative field . . . [t]he federal regulatory scheme here is not merely pervasive but preempts *all* state and local regulation") (internal quotations omitted); *see also Int'l Aerobatics Club Chapter 1 v. City of Morris*, -- F. Supp. 3d --, 2014 WL 7330973, at *8 (N.D. Ill. 2014) (holding municipal ordinances preempted to the extent they seek to regulate activity that falls under the FAA's existing regulations).

In *Blackwell*, a similar case involving SkyWest customer service representatives' wage claims, the district court concluded that application of California's wage and hour law would affect SkyWest's "rates and routes" because in order to comply, SkyWest would have to reduce or eliminate routes, and interrupt services, resulting in "cascading flight delays, increased risk of death or serious injury to passengers and damage to aircraft, and security breaches." 2008 WL 5103195, at *17-18. The court also found that enforcing state wage laws would cause SkyWest to pass labor costs on to the customer and "increased prices result in lower ticket sales, making regional stations unprofitable and prompting carriers to discontinue routes." *Id.* at *18. As a result, "smaller communities are likely to lose access to air transportation because increased labor costs will force carriers like SkyWest to price flights above what the market would bear and, ultimately, discontinue routes to these communities." *Id.* This is the "forbidden significant effect" on routes, prices, and services that the ADA seeks to prevent. *Id.*[7]

---

[7]     Other courts have also enforced the ADA preemption doctrine to bar the application of state wage laws to airline employees. *See, e.g.*, *Angeles v. U.S. Airways*, 2013 WL 62032, at *9 (N.D. Cal. Feb. 19, 2013) (ADA preempted California wage and hour laws as applied to fleet service agents ("FSAs") because relieving an FSA from duty as required by California law could prevent fueling or servicing of an aircraft or unloading of luggage that would impact the schedule of the carrier); *Brown v. United Air Lines, Inc.*, 656 F. Supp. 2d 244, 250 (D. Mass. 2009) (ADA preempted Massachusetts wage and hour laws where skycaps claimed that the airline's imposition of a mandatory $2.00 fee for checking luggage with skycaps interfered with skycaps' tips because customers assumed the fee was a mandatory gratuity); *Travers v. JetBlue Airways Corp.*, 2009 WL 2242391, at *3 (D. Mass. July 23, 2009) (same).

Here, the impact is even more direct. Plaintiffs are asking this Court to interpret the IMWL to require SkyWest (and other airlines for that matter) to restructure their collective bargaining agreements pursuant to Illinois' minimum wage policies.[8] To comply, SkyWest would have to redesign the crew compliments, routes and stage lengths (impacting routes and services), which impermissibly impacts the rates charged to the public. Again, this is only one State. It would be impossible to design a route system and crew compliment to comply with all 50 States' wage and hour regulations without severely impacting the routes, rates and services offered by the airline. This is the precise sort of state re-regulation that the ADA forbids.

**D.     The RLA Preempts Plaintiffs' FLSA And IMWL Claims Because Plaintiffs' Claim Cannot Be Resolved Without Applying And Interpreting The Agreement.**

Plaintiffs' conclusory allegations notwithstanding, Plaintiffs (and all other SkyWest flight attendants) are represented by SIA; the Agreement is an RLA collective bargaining agreement; and Plaintiffs' claims require interpretation of the Agreement. In fact, when some SkyWest flight attendants subject to the same Agreement filed the same claims under California law, the California Court of Appeals affirmed the trial court's finding that the RLA preempted the flight attendants' claims in that (a) SIA was the flight attendants' representative; (b) the Agreement was an RLA collective bargaining agreement; and (c) the resolution of Plaintiffs' claims required interpretation of the Agreement. *Fitz-Gerald,* 155 Cal. App. 4th at 419; *see also Blackwell*, 2008 WL 5103195, at *13 (same holding with respect to customer services representatives for SkyWest).

---

[8]     In addition, Plaintiffs' intent appears even broader, as they apparently intend to argue that even each *city's* unique wage laws require separate compliance. (Compl. ¶ 147) ("pending legislation to the raise the minimum wage in … Chicago will exacerbate the problems with this airline's compensation plan…"). (Emphasis added). As set forth in Figure 1 and 3 to the Complaint, flight attendants routinely traverse many cities in very short periods of time; the application of not only State regulation, but *local* regulation, vitiates the very purpose of the ADA.

In *Fitz-Gerald*, as in this case, flight attendants claimed that SkyWest failed to pay them for minimum wage on an hour-by-hour theory and also that SkyWest failed to pay overtime in violation of the California wage and hour laws. Relying on *Adames v. Executive Airlines, Inc.* 258 F.3d 7 (1st Cir. 2001), the court held that the flight attendants' claims required interpretation of the Agreement between SIA and SkyWest, and thus the claims were preempted by the RLA.[9] Here, as in *Fitz-Gerald*, *Blackwell*, and *Adames*, the RLA preempts Plaintiffs' wage and hour claims because they cannot be addressed without interpreting the applicable CBA.

  1.  *SkyWest is a "carrier" under the RLA.*

The RLA defines "carrier" as "every common carrier by air engaged in interstate or foreign commerce." RLA Section 181. It is undisputed that SkyWest is an airline that transports both people and cargo by way of air across state lines.

  2.  *SIA is the "representative" of SkyWest Flight Attendants under the RLA.*

It also cannot be disputed that SIA is SkyWest's flight attendants' "representative" as defined by the RLA. The RLA defines "representative" as "any ... organization ... designated either by a carrier ... or by its or their employees, to act for it or them." RLA Section 151, Sixth. The RLA permits an air carrier's employees to designate the representative of their choice to bargain and settle disputes on their behalf. RLA Section 152, Second and Third.

SkyWest's flight attendants exercised this right over 25 years ago when they founded SIA to act as their "representative." SIA is responsible for negotiating with management regarding the terms and conditions of employment, including wages, work hours, benefits and

---

[9]  In *Adames*, the First Circuit held that claims under Puerto Rico's wage laws required interpretation of a collective bargaining agreement and were preempted by the RLA. The court recognized that Puerto Rico law (like Illinois law) "relies on conventional pay mechanisms, such as hourly wages, which may not reflect the methods of remuneration in the airline industry" and that "the peculiarities of [airline] industry-specific wage and benefit structures are apparent in the collective bargaining agreement between the flight attendants and Executive." *Adames*, 258 F.3d at 13.

other compensation for *all* SkyWest flight attendants. SIA is a "representative" because it is an organization designated by SkyWest's flight attendants to act for them, and has done so since 1994. SIA is, in fact, the exclusive bargaining representative for SkyWest's flight attendants. (Nicolay Dec. at ¶¶ 3-5.)

In *Fitz-Gerald*, the court specifically addressed the question of whether the SIA must be a "union" to qualify as a "representative" under the RLA, holding:

> Appellants assert there is no CBA because SkyWest is a non-union employer. The argument is without merit. Under the RLA, airline employees have the right to organize and bargain collectively through representatives of their own choosing. The RLA provides that "the term 'representative' means any person or persons, labor union, organization, or corporation *designated either by a carrier or group of carriers or by its or their employees,* to act for it or them." "There are no qualifiers attached to the [RLA's] simple definition of 'representative.' The 'representative' of a craft of employees is, simply, a person or union [or an association] designated to act on their behalf, to accomplish what they seek to accomplish, and is not necessarily a man [or woman] for all seasons."

155 Cal. App. 4th at 419.[10]

> 3. *The Agreement entered into by SkyWest and SIA is a collective bargaining agreement under the RLA.*

The primary purpose of the RLA is to avoid disruptions to vital air and rail services due to labor unrest. RLA Section 151a. To effectuate this purpose, the RLA provides:

> It shall be the duty of all carriers, their officers, agents, and employees to exert every reasonable effort to make and maintain agreements concerning rates of pay, rules and working conditions, and to settle all disputes, whether arising out of the application of such agreements or otherwise, in order to avoid an interruption to commerce or to the operations of any carrier growing out of any dispute between the carrier and the employees thereof.

RLA Section 152, First. Although the RLA does not define "collective bargaining," it has been defined as "[n]egotiations between an employer and the representatives of organized employees

---

[10] Plaintiffs spend much of the Complaint asserting SkyWest is a non-union employer. But, as held by the *Fitz-Gerald* court, "union" status is not determinative of "representative" status under the RLA.

to determine the conditions of employment, such as wages, hours, discipline, and fringe benefits." Black's Law Dictionary (10th ed. 2014).

As addressed above, SkyWest and SIA engage in collective bargaining negotiations, during which they address wages, hours, schedules, bidding, work rules (including discipline and fringe benefits) and working conditions, including provisions for resolving disputes among SIA, employees and SkyWest. SIA and SkyWest have successfully negotiated agreements this way for 25 years, leading to the execution of collective bargaining agreements by both SkyWest executives and SIA's President.  The Agreement is provided to – and applies to – *all* flight attendants, and SkyWest does not negotiate with any individual regarding subject matters covered by the Agreement.  Significantly, the Agreement *cannot* be revised unilaterally; both SkyWest and SIA must agree to any revision.  (Nicolay Dec. at ¶¶ 5-7; Doc. No. 22-2.)

The relationship between SkyWest and SIA exhibits every indicia of a collective bargaining relationship.   Again, the court's opinion in *Fitz-Gerald* is directly on point.  Just as the court concluded that SIA was an RLA representative, it concluded that the Agreement was an RLA covered agreement, holding:

> Here the CBA was negotiated by SIA, an employee organization recognized by SkyWest and SkyWest FAs. For more than 10 years, SIA has negotiated wage and benefit plans that have been approved by SkyWest FAs and made a part of the SkyWest Crewmember Policy Manual.

155 Cal. App. 4th at 419.  That same logic applies here.

4.     *The Court cannot resolve Plaintiffs' claims without interpreting the Agreement.*

The final question is whether the resolution of Plaintiffs' minimum wage and overtime claims require interpretation and/or application of the Agreement.  *See, e.g.*, *Fitz-Gerald*, 155 Cal. App. 4th at 419; *Blackwell*, 2008 WL 5103195, at *13.  It is well-established that state claims are preempted (and federal claims precluded) by the RLA if their resolution requires the

interpretation or application of a collective bargaining agreement. *Hawaiian Airlines, Inc. v. Norris* 512 U.S. 246, 261 (1994); *see also Allis-Chalmers Corp. v. Lueck* 471 U.S. 202, 213 (1985) (finding that state claims inextricably intertwined with consideration of a collective bargaining agreement are preempted).

In several cases, courts have determined that the resolution of state law minimum wage and overtime claims brought by flight attendants required interpretation of a bargaining agreement, and were thus preempted by the RLA. Most directly on point, of course, is *Fitz-Gerald*, which involved minimum wage and overtime claims, the same SkyWest employees, the same representative, and the same Agreement. Citing two cases involving Executive Airlines, and holding that the flight attendants' claims were preempted by the RLA, the court stated as follows:

> The trial court, however, could not determine the regular rate of compensation without interpreting the CBA. (See e.g., *Adames v. Executive Airlines, Inc., supra,* 258 F.3d at p. 15.) A similar preemption problem arose in *Burgos v. Executive Air., Inc.* (U.S.D.C. Puerto Rico 1996) 914 F. Supp. 792. There, a flight attendant sued for minimum wage and overtime pay under Puerto Rico law. The federal court held that the action was preempted by the RLA because flight attendant compensation was based on a CBA that took into account flight time, on duty time, and a flight time guarantee. "[P]laintiff's status under Puerto Rico law depends upon the interaction of three separate articles of the CBA. Whether she 'worked'—broadly defined as hours 'on duty'—more than the statutorily prescribed maximums is not dispositive of her claim since her pay was not tied to hours worked, but rather her guarantee. Determining whether she was under-paid would require ascertaining her 'flight time' both for that week and for the month, as well as her on-duty time. After calculating these figures, the CBA would need to be consulted to determine both base and overtime pay. Then her total pay, separating her guarantee from overtime pay, would need to be compared to on-duty time in order to calculate her effective hourly salaries (base and overtime). Only at this point could Burges' status under the law be determined.''

155 Cal. App. 4th at 421-22.

Although involving a different type of employee, the court's decision in *Blackwell* is equally instructive. Faced with the question of whether the plaintiff's California minimum wage

and overtime claims required interpretation or application of the agreement between SkyWest and the SkyWest Airlines' Frontline Association, the court began by noting that the agreement "provided pay rates for different work categories, including straight time, supervisor overrides, voluntary shifts, split shifts, holidays, travel, training, jury duty, vacation, and personal user days." *Id*. at 12. "Given the many applicable pay rates, categories, and differentials, any attempt to determine whether, when, and how much compensation is owed to Blackwell necessarily requires an interpretation of the CBA's provisions." *Id*; *see also Anderson v. JCG Indus., Inc.*, 2009 WL 3713130, at *4 (N.D. Ill. Nov. 4, 2009) (holding, under analogous LMRA preemption analysis, that although the IMWL provides independent overtime requirements, the CBA had its own overtime provisions above Illinois law's requirements, and plaintiffs' claims depended on interpretation of CBA to determine if plaintiffs' overtime pay was properly recorded and paid under the CBA).

Here, just as in *Fitz-Gerald*, *Blackwell, Adames,* and *Burgos,* Plaintiffs' minimum wage and overtime claims require interpretation and application of the Agreement because the Agreement: (1) defines the flight attendants' duties, which drive the number of hours worked; and (2) defines the compensation package, which ultimately determines the regular rate. A chart summarizing just some of the hours worked and compensation provisions of the CBA that must be interpreted to resolve Plaintiffs' minimum wage and overtime claims is attached hereto as Exhibit 3. The Court would need to interpret and apply these and other provisions of the Agreement to determine the number of hours worked, and then interpret and apply other provisions to determine compensation, and ultimately determine the "regular rate." (Wolford Dec. at ¶¶ 9-12.) Because Plaintiffs' claims for uncompensated work cannot be resolved without

interpreting the Agreement, they are preempted by the RLA, and should be dismissed pursuant to Fed. R. Civ. P. 12(b)(1) for lack of subject matter jurisdiction.

## III. PLAINTIFFS LACK STANDING TO SEEK DECLARATORY AND INJUNCTIVE RELIEF.

Lastly, because Plaintiffs are not currently employed by SkyWest, they lack standing to seek declaratory, equitable, or injunctive relief. (*See* Compl. at ¶¶ 35-37, 154-164.)[11] *See Feit v. Ward*, 886 F.2d 848, 857 (7th Cir. 1989) (holding plaintiff could not pursue equitable claims on behalf of defendant's current employees because the plaintiff was not subject to an immediate threat of injury from the alleged unlawful conduct and would not benefit from the requested relief). "To meet the standing requirement of Article III, a plaintiff must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." *Raines v. Byrd,* 521 U.S. 811, 818 (1997) (internal citations omitted); *see also Mintz v. Mathers Fund, Inc.*, 463 F.2d 495, 498-99 (7th Cir. 1972) ("Before one may successfully institute a class action, it is, of course, necessary generally that he be able to show injury to himself in order to entitle him to seek judicial relief.").[12]

Because Plaintiffs no longer work for SkyWest, they cannot show an immediate risk of injury as a result of SkyWest's alleged conduct and they would not benefit from any declaratory or injunctive relief. For these reasons, Plaintiffs' claims for injunctive and declaratory relief must be dismissed with prejudice.

---

[11]     The Complaint avers that Plaintiffs were employed with SkyWest until September 2010, September 2012, and November 2014, respectively. (Compl. at ¶¶ 35-37.)

[12]     Other district courts have reached this same conclusion. *See Ruffin v. Exel Direct Inc.*, 2009 WL 3147589, at *1, *3 (N.D. Ill. Sept, 29, 2009) (former independent contractors lacked standing to seek declaratory and injunctive relief based on alleged misclassification); *see also Brown v. Cty. of Cook*, 549 F. Supp. 2d 1026, 1031-32 (N.D. Ill. 2008) (dismissing prayer for injunctive relief in putative class action where former employee was not in danger of future harm and lacked standing); *Butler v. Ill. Bell Tele. Co.*, 2008 WL 474367, at *7 (N.D. Ill. Feb. 14, 2008) (former employees lacked standing to pursue injunctive relief and could not be class representatives for Rule 23(b)(2) class).

## CONCLUSION

For all the foregoing reasons, Defendants SKYWEST, INC. AND SKYWEST AIRLINES, INC. respectfully request that this Court enter an order:

(a)     Dismissing with prejudice Plaintiffs' claim for relief under the Fair Labor Standards Act;

(b)     Dismissing with prejudice Plaintiffs' claim for relief under the Illinois Minimum Wage Law;

(c)     Dismissing with prejudice Plaintiff's claims for declaratory and injunctive relief; and

(d)     Awarding all relief that the Court deems just and proper.


DATED:   July 10, 2015.                           Respectfully submitted,


                                      By:    /s/ Colleen Grace DeRosa
                                             One of the Attorneys for Defendants
                                             SKYWEST, INC. and SKYWEST
                                             AIRLINES, INC.

Michael H. Cramer (ARDC No. 6199313)
Michael D. Ray (ARDC No. 6285109)
Colleen G. DeRosa (ARDC No. 6301589)
OGLETREE, DEAKINS, NASH,
    SMOAK & STEWART, P.C.
155 North Wacker Drive, Suite 4300
Chicago, Illinois 60606
Telephone:  312.558.1220
Facsimile:  312.807.3619
*michael.cramer@ogletreedeakins.com*
*michael.ray@ogletreedeakins.com*
*colleen.derosa@ogletreedeakins.com*

## CERTIFICATE OF SERVICE

The undersigned attorney hereby certifies that on July 10, 2015, the foregoing *Defendants' Memorandum of Law in Support of Its Motion to Dismiss Plaintiffs' Amended Class Action Complaint* was filed electronically with the Clerk of Court using the ECF system, which sent notification of such filing to:

>Gregory F. Coleman
>Adam Edwards *(pro hac vice)*
>Mark Silvey *(pro hac vice)*
>Lisa A. White *(pro hac vice)*
>**GREG COLEMAN LAW, PC**
>550 Main Avenue, Suite 600
>Knoxville, TN 37902
>*greg@gregcolemanlaw.com*
>*adam@gregcolemanlaw.com*
>*mark@gregcolemanlaw.com*
>*lisa@gregcolemanlaw.com*

>Edward A. Wallace
>Amy E. Keller
>**WEXLER WALLACE LLP**
>55 West Monroe Street, Suite 3300
>Chicago, IL 60603
>*eaw@wexlerwallace.com*
>*aek@wexlerwallace.com*

>*Attorneys for Plaintiffs and Proposed Class*


        /s/ Colleen Grace DeRosa