# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

|  |  |  |
|---|---|---|
| ANDREA HIRST, MOLLY STOVER, and EMILY STROBLE SZE, on behalf of themselves individually and all others similarly situated, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | No. 15 C 02036 |
| v. | ) ) | Judge John J. Tharp, Jr. |
| SKYWEST, INC. and SKYWEST AIRLINES, INC., | ) ) ) ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

The plaintiffs, Andrea Hirst, Molly Stover, and Emily Stroble Sze, are former flight attendants ("FAs") with SkyWest Airlines, Inc. They bring this action on behalf of themselves and all other similarly situated FAs who were paid hourly wages by SkyWest, Inc. and SkyWest Airlines, Inc. (collectively, "SkyWest") within the three years prior to the filing of this suit. The plaintiffs allege that SkyWest's compensation scheme—under which they were not paid based upon the total hours they worked in a given duty day but only for the number of block time hours they worked when the aircraft's main cabin door was closed—violates the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 206, 216(b), and the Illinois Minimum Wage Law ("IMWL"), 820 Ill. Comp. Stat. 105/1-15. The defendants move to dismiss the Amended Complaint under Rule 12(b)(6) for failure to state a claim and move to dismiss the IMWL claim under Rule 12(b)(1) for lack of subject matter jurisdiction. Mt. Dismiss, ECF No. 35. As will be explained, the characterization of some of SkyWest's arguments as jurisdictional is mistaken, but the error is of no consequence. For the following reasons, the motion to dismiss is granted.

## I. Flight Attendant Duties, Schedules, and Compensation

Defendant SkyWest, Inc. is the parent company of defendant SkyWest Airlines, Inc. and another airline (ExpressJet Airlines, Inc.) that is not involved in this litigation. Am. Compl. ¶ 42, ECF No. 22. The plaintiffs state, "upon information and belief," that SkyWest currently employs approximately 2,663 FAs, with 389 based out of Chicago O'Hare International Airport. Am. Compl. ¶ 44.

The plaintiffs are former FAs with SkyWest: Andrea Hirst was employed from April 20, 2010 until May 10, 2015 and was based out of O'Hare Airport for the majority of her tenure with SkyWest (the Amended Complaint does not indicate where else Hirst was based or for what period of time). Am. Compl. ¶ 35. Molly Stover was employed from August 9, 2012 until November 2014 and was based out of O'Hare the entirety of her tenure with SkyWest. Am. Compl. ¶ 36. Emily Stroble Sze was employed from June 2010 until September 2012 and was based out of O'Hare the majority of her tenure with SkyWest (again, the Amended Complaint does not indicate where else Sze was based or for what period of time). Am. Compl. ¶ 37.[2]

The schedules of SkyWest FAs are recorded down to the minute in the SkedPlus+ system. Am. Compl. ¶ 9. The minute-by-minute schedule for an FA's series of work trips (a "pairing") is recorded in the "paring details." Am. Compl. ¶ 11, Fig. 1. The pairing details reflect the actual circumstances of the pairing as flown and are available for each employee for the past several years on the SkedPlus+ system. Am. Compl. ¶ 12. The pairing details identify the FA by her employee number and name, list her domicile, level of training, and position. Am. Compl.

---

[1] As this is a motion to dismiss, the Court accepts all well-pleaded facts as true and construes all inferences in favor of the plaintiff. *Zemeckis v. Global Credit & Collection Corp.,* 679 F.3d 632, 634 (7th Cir. 2012).

[2] Because all of the named plaintiffs are women, this opinion uses female pronouns.

¶ 13. The details list the FA's "report time"—the time at which she must have arrived at the airport in uniform with all of her mandatory items for duty, cleared security, and checked in electronically on SkyWest's computer system. Am. Compl. ¶¶ 14, 54-60. If an FA reports earlier than is listed on the pairing details, the required time rather than the actual report time is recorded. *Id.*

Each flight has a "block time," which is the actual length of time that it took to fly between the two destinations on the specific day; block time begins with "block out," when the main cabin door is closed and the aircraft moves away from the jet bridge, and ends with "block in," when the aircraft arrives at the destination jet bridge and the main cabin door is opened. Am. Compl. ¶ 18. Block time is closely related to "credit time," which is the time a flight (called a "leg") is estimated to take. Am. Compl. ¶¶ 22, 25. FAs are entitled to hourly compensation based on the greater of the two time periods: When block time is less than credit time (*i.e.*, the flight landed early), FAs are compensated based on the estimated credit time. Am. Compl. ¶ 25. When block time exceeds credit time, FAs are entitled to additional compensation based on the block time and must submit a payroll correction form to receive the increased compensation. Am. Compl. ¶¶ 26, 80.

Some of the duties of a SkyWest FA are: "to ensure the safety of the passengers through required inspections of the aircraft prior to and after each flight, to assist passengers while the passengers are boarding or are onboard the aircraft, to provide customer service such as serving meals and drinks, and to assist passengers and the flight crew until all passengers have departed from the aircraft." Am. Compl. ¶ 50. Once on board but prior to closing the cabin door, FAs must perform a number of duties mandated by the Federal Aviation Administration ("FAA"), including but not limited to: conducting a preflight and pre-boarding safety check, participating

in a pre-flight briefing with other crew members, and verifying that the commissary supply is sufficient. *See* Am. Compl. ¶ 61. After the aircraft blocks in and all passengers have deplaned, FAs must perform additional duties required by the FAA: they must, for example, check all emergency and safety equipment to verify that nothing has been tampered with during the flight, remove all trash, straighten and cross seatbelts, fold blankets, and clean the cabin (except on the final flight of the day), and verify that the aircraft is stocked and ready for subsequent flights, among other things. Am. Compl. ¶ 68.

The time between scheduled legs on a duty day is recorded as "turn time": if turn time is fewer than 45 minutes, FAs are generally not permitted leave the airplane (and are strictly prohibited from leaving the aircraft while any passenger remains on board). Am. Compl. ¶¶ 19, 67. If the turn time lasts more than an hour, FAs may leave the plane but are required to remain in the airport and in full uniform. Am. Compl. ¶ 20. Any unanticipated delays (*e.g.*, mechanical problems or weather delays) are recorded as turn times; FAs are not compensated during either scheduled or unanticipated turn times. Am. Compl. ¶¶ 21, 64. Nor do SkyWest FAs receive any "holding pay" for circumstances where passengers are onboard but the plane is held at the gate. Am. Compl. ¶ 64.

The "release time," marking the end of an FA's daily shift, is automatically set at 15 minutes after the cabin door is opened on the last flight of the day. Am. Compl. ¶ 15. The time between an FA's report time and release time is her "duty day," during which time FAs are required to be in uniform and are under SkyWest's direction. Am. Compl. ¶ 16. The maximum length of an FA's duty day is regulated by the FAA. Am. Compl. ¶ 17; *see* 14 CFR 121.467(b) (setting an FA's maximum duty day at 14 hours, with limited exceptions). FAs work between

one and seven or more legs in any given duty day and are guaranteed a minimum of four hours of block time for every duty day. Am. Compl. ¶¶ 53, 74.

The pairing details include a "trip summary," which lists the first report time and the last release time of the entire pairing, the total length of the pairing ("time away from base"), and the cumulative block time and credit time for the entire pairing. Am. Compl. ¶ 27. In addition to the hourly compensation based on the credit and block time, FAs receive a non-taxable per diem of $1.80 per hour for every hour of time away from base. Am Compl. ¶ 28. If an FA volunteers to be "junior manned" (*i.e.*, work overtime), she is paid at one and one half times her regular hourly rate. Am. Compl. ¶ 80(C) and n.6.

## II. The Plaintiffs' Experiences as SkyWest FAs

The Amended Complaint describes two of Andrea Hirst's SkedPlus+ pairings: in the first, a four-day trip from October 30, 2012 through November 2, 2012, Hirst was compensated for a total of 19 hours and 10 minutes (her credit time, which exceeded her block time of 18 hours and 19 minutes). Am. Compl. ¶ 29. The Amended Complaint alleges that Hirst should have been compensated for all of her duty time in those four days, a total of 33 hours and 44 minutes. Am. Compl. ¶ 29. In the second example, the Amended Complaint focuses on a single day, December 22, 2014, during which Hirst's first leg was delayed by approximately six hours (which, as it was not block time, was uncompensated) due to late arrival of the aircraft: on that day, Hirst's duty day totaled 14 hours and 49 minutes, but she was compensated for a total of 7 hours and 48 minutes. Am. Compl. ¶¶ 99-101. In total during the four-day pairing from December 21, 2014 through December 24, 2014 (including December 22), Hirst's duty time totaled 37 hours and 48 minutes and credit time (because credit time again exceeded block time) totaled 24 hours and 55 minutes. *See* Am. Compl. Fig. 3. The Amended Complaint does not

include Hirst's hourly rate for either of these examples or the amount she received as compensation for either pairing. The Policy Manual, however, includes a chart of FAs' hourly rates (to which the plaintiffs refer, *see* Am. Compl. ¶ 80(A) and n.5) based on an FA's years of service with SkyWest. *See* Am. Compl. Ex. 2 § 2327. Hirst began work as an FA with SkyWest in 2010 and had served two years at the time of the first example pairing in late 2012, so it appears that her hourly rate would have been $22.49. *Id.* There is no information as to Hirst's hourly rate in 2014 (the chart only extends through 2012), which likely increased due to her additional experience. (The hourly rate in 2012 for an FA with four years of experience was $24.73.) *Id.*

As to Molly Stover, the Amended Complaint does not include any pairing details or any specific examples of the hours she worked or the compensation she received. Rather, the Amended Complaint generally describes two experiences in which Stover experienced flight delays, once in February or March of 2014, where she had an unscheduled stay overnight and returned to her base in Chicago the following day, and once in the summer of 2014, when she was delayed for five hours. Am. Compl. ¶¶ 102-104. In both instances, Stover did not receive "additional wage compensation" for her extended duty day. *Id.*

The factual allegations with respect to Sze are even more limited: Sze asserts that she was not informed that her block pay would be averaged across her workday but, instead, was told that the per diem reimbursement was how she would be compensated for all other hours. Am. Compl. ¶ 108. She received one and one half times her regular rate only when she was "junior manned" (*i.e.*, voluntarily accepted an overtime pairing, *see* Am. Compl. ¶ 80(C) n.6) and worked on a scheduled day-off. Am. Compl. ¶ 109. As with Stover, there are no allegations regarding the hours Sze worked, her hourly wage, or the amount of compensation she received.

Generally, the Amended Complaint asserts that because SkyWest's compensation scheme does not adjust to unexpected delays and longer than scheduled duty days, "the FAs are at risk of and do actually receive less than the Federal minimum wage [and the Illinois minimum wage] on certain workdays, even if this Court were to adopt a weekly averaging of wage compensation." Am. Compl. ¶¶ 133, 146. Additionally, the plaintiffs assert that "SkyWest FAs are not paid at a higher rate of pay for hours worked over 40 per week. At most, flight attendants receive a $3.00 per hour increase for working over 87 'block hours' in a month." Am. Compl. ¶ 148. The plaintiffs allege that SkyWest does not verify compliance with minimum wage laws "for every FA for every week" and that due to the "unnecessary complexity of SkyWest's pay stubs . . . FAs are unlikely to be able to accurately determine their true hourly compensation if and when they have reason to believe they are being under compensated." Am. Compl. ¶ 92.

## III.    Flight Attendant Representation

SkyWest FAs are not represented by a union, but SkyWest InFlight Association ("SIA"), an organization of FAs, negotiates FAs' work responsibilities and benefits with SkyWest management on behalf of all FAs. Am. Compl. ¶¶ 3-4; Ex. 2 § 2303 (letter of agreement between SkyWest and SIA). The policies and benefits negotiated between SIA and SkyWest are memorialized in the Flight Attendant Policy Manual. Am. Compl. ¶ 4 and Ex. 2.

The plaintiffs allege "upon information and belief" that SkyWest refers to the Policy Manual as a collective bargaining agreement ("CBA"), although the Policy Manual does not include "any compulsory mediation requirements, an arbitration clause, discussion of any 'cooling off period' or 'self-help' provisions or restrictions." Am. Compl. ¶¶ 5-6, 82-83. They also assert that SkyWest's employment policy (Am. Compl. Ex. 6) does not refer to its negotiations with SIA or the Policy Manual as a collective bargaining agreement and merely

describes SIA's "input" in management decisions. Am. Compl. ¶ 82. The plaintiffs allege that SIA and the comparable pilots' association have no bargaining power with respect to uncompensated work hours because SkyWest management "is and has been completely unwilling to discuss or listen to employee input . . . about paying hourly compensation for any time other than block time." Am. Compl. ¶ 85.

The Amended Complaint asserts that employee grievances are unilaterally decided by SkyWest management, rather than through a mutually chosen arbitrator or mediator. *See* Am. Compl. ¶ 83. The Policy Manual includes a procedure for FAs to file formal grievances when they have a disagreement "concerning the interpretation of any terms" in the Policy Manual: the FA submits the grievance to SIA; if SIA determines the grievance is justified, it meets with the "appropriate Company personnel for corrective action or a satisfactory resolution." Am. Compl. Ex. 2 § 2325.3. It appears FAs can appeal the decision on their grievance, although the Manual is not clear to whom they appeal or how the appeal is decided. *See id.* § 2325.4(C)-(D) ("Whenever two or more employees have a common or similar complaint, the flight attendant selects one or more of them to represent the group. The final decision on the appeal is binding on all members of the group.").

Two of the plaintiffs, Hirst and Stover, filed a Complaint on behalf of themselves and all other similarly situated FAs against the defendants, alleging that the failure to compensate FAs for every hour they worked violates the FLSA and the IMWL and that failure to compensate FAs at a higher rate for hours worked in excess of 40 hours per week violates the IMWL. *See* Compl., ECF No. 1. Shortly thereafter, the plaintiffs filed the Amended Complaint, adding Sze as an additional plaintiff. *See* Am. Compl. ¶¶ 37, 107-110. In addition to monetary damages for unpaid wages, the Amended Complaint seeks a declaration requiring that SkyWest explain various

aspects of its compensation scheme to current and former FAs and an injunction barring SkyWest from referring to the per diem payment as "per diem pay" or "per diem wages." Am. Compl. ¶¶ 157-63. The plaintiffs filed a "placeholder" motion for class certification, *see* ECF No. 23, which this Court denied after the Supreme Court issued its opinion in *Campbell-Ewald Co. v. Gomez*, 136 S. Ct. 663 (2016). *See* Min. Orders, ECF Nos. 60-61. The plaintiffs also filed a motion to proceed as a collective action, for tolling of the statute of limitations, for court-authorized notice, and for disclosure of the contact information of the potential opt-in plaintiffs. *See* Pl. Misc. Mt., ECF No. 24. The defendants have moved to dismiss the Amended Complaint for failure to state a claim and for lack of subject matter jurisdiction. Because the jurisdictional challenge pertains only to a subset of the plaintiffs' claims (the state law IMWL claims), and is not actually a challenge to this Court's jurisdiction, and because the discussion of the plaintiffs' FLSA claims will inform discussion of the state law claims that are the subject of that aspect of the defendants' motion, the FLSA claims will be addressed first.

## DISCUSSION

"To survive a motion to dismiss under Rule 12(b)(6), a complaint must 'state a claim to relief that is plausible on its face.'" *Adams v. City of Indianapolis*, 742 F.3d 720, 728 (7th Cir. 2014) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "'A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Adams*, 742 F.3d at 728 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). Although notice pleading under Rule 8 is a more lenient standard than the code pleading that preceded it, "it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Iqbal*, 556 U.S. at 678-79. A court must accept all of the plaintiff's factual allegations as true when reviewing the complaint, but conclusory allegations merely restating the elements of a cause of action do not

receive this presumption: "a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth. While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Id.* at 679; *see also Twombly*, 550 U.S. at 555 ("a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions").

## I.      FLSA Claim

The FLSA requires that "[e]very employer shall pay to each of his employees who in any workweek is engaged in commerce . . . not less than—$7.25 an hour." 29 U.S.C. § 206(a)(1)(C). But how is it determined whether an employee has received that hourly rate? The rate may vary depending on the methodology used. Consider, for example, an employee (we'll call him Joe) who is paid a flat rate of $60 per work day and works no more than 40 hours a week but on a varied schedule, some days working up to 12 hours per day and others working as few as 4 hours. If Joe's hourly rate is computed on a daily basis, on a 12-hour day his rate of pay would be $5 per hour ($60/12 hours), below the required minimum wage. But if his schedule is computed on a weekly basis, and he works 40 hours during the week, Joe's hourly rate of pay would be $7.50 ($300/40 hours), 25 cents per hour above the required minimum wage.

A consistent methodology for determining the wage paid is therefore required. In determining whether an employer has violated the minimum wage provision of the FLSA, courts uniformly calculate the hourly wage over the course of a workweek—*i.e.*, dividing the total compensation an employee received in a workweek by the compensable hours worked. Although the Seventh Circuit has not expressly addressed this issue, every circuit court that has considered the issue has utilized the workweek averaging approach to determine whether a FLSA violation

occurred. *See, e.g.*, *Adair v. City of Kirkland*, 185 F.3d 1055, 1063 (9th Cir. 1999) ("The district court properly rejected any minimum wage claim the officers might have brought by finding their salary, when averaged across their total time worked, still paid them above the minimum wage."); *U.S. Dep't of Labor v. Cole Enterprises, Inc.*, 62 F.3d 775, 780 (6th Cir. 1995) ("[A]n employer meets the minimum wage requirements if the total weekly wage paid is equal to or greater than the number of hours worked in the week multiplied by the statutory minimum hourly rate."); *Hensley v. MacMillan Bloedel Containers, Inc.,* 786 F.2d 353, 357 (8th Cir. 1986) ("no [FLSA] violation occurs 'so long as the total weekly wage paid by an employer meets the minimum weekly requirements of the statute, such minimum weekly requirement being equal to the number of hours actually worked that week multiplied by the minimum hourly statutory requirement.'" (quoting *United States v. Klinghoffer Bros. Realty Corp.,* 285 F.2d 487, 490 (2d Cir. 1960)); *Dove v. Coupe*, 759 F.2d 167, 171-72 (D.C. Cir. 1985) ("While the minimum wage laws logically could be construed as requiring hour-by-hour compliance, [ ] both administrative and judicial decisions established the workweek as the measuring rod for compliance . . . ."); *Olson v. Superior Pontiac-GMC, Inc.*, 765 F.2d 1570, 1576-77 (11th Cir.), *modified on other grounds*, 776 F.2d 265 (11th Cir. 1985) (applying weekly averaging approach to example compensation scheme); *Blankenship v. Thurston Motor Lines,* 415 F.2d 1193, 1197-98 (4th Cir. 1969) (applying the weekly averaging approach). The U.S. Department of Labor endorses the weekly averaging approach as well. *See, e.g.*, 29 C.F.R. §§ 776.4 ("The workweek is to be taken as the standard in determining the applicability of the [FLSA]."); 776.5 (requirement that minimum wages shall be paid "at a rate not less than a specified rate 'an hour' . . . means that whatever the basis on which the workers are paid, whether it be monthly, weekly, or on a piecework basis, they must receive at least the equivalent of the minimum hourly rate"); 778.105

("For purposes of computing pay due under the Fair Labor Standards Act, a single workweek may be established . . . .").

The plaintiffs nevertheless argue for the adoption of a daily minimum wage determination. They assert that "SkyWest's wage compensation plan does not sufficiently adapt . . . such that *every hour of every FAs' workday* is compensated at no less than the applicable minimum wage. Therefore, upon information and belief, the FAs are at risk of and do actually receive less than the Federal [and Illinois] minimum wage *on certain workdays*." and Am. Compl. ¶¶ 133, 146 (emphasis added). They don't offer any legal authority for this novel daily compliance determination, asserting only that "the possibility [of such an approach] has not been precluded in the district courts [in the Seventh Circuit]." Resp. 11, ECF No. 51 (citing *Dominguez v. Quigley's Ir. Pub, Inc.*, 790 F. Supp. 2d 803, 816 (N.D. Ill. 2011); *Solis v. Saraphino's, Inc.*, No. 09-CV-954, 2011 WL 1532543, at *4 (E.D. Wis. Apr. 22, 2011)). The Court is persuaded by the overwhelming authority applying the workweek averaging approach, and the lack of authority endorsing the daily compliance approach, that the workweek averaging approach is the appropriate method for determining a FLSA violation.

The plaintiffs repeatedly assert that SkyWest violated the FLSA by failing to compensate them for every hour they worked in the performance of "integral and indispensable activities." *See, e.g.*, Am. Compl. ¶¶ 53, 68, 78, 86, 128, 131-32, 145; Resp. 14-15. Any activity that is integral and indispensable to an employee's principle activity—*i.e.*, "it is an intrinsic element of those activities and one with which the employee cannot dispense if he is to perform his principal activities"—is compensable under the FLSA. *Integrity Staffing Sols., Inc. v. Busk*, 135 S. Ct. 513, 517 (2014). The plaintiffs, however, misunderstand the term "compensable" as used in reference to the FLSA. Even assuming that every hour of an FA's duty day is spent performing

"integral and indispensable activities," and thus, is compensable, that does not mean the plaintiffs must be paid an hourly wage for that specific hour; it means that such an hour must be included in the calculation of the total hours worked in that workweek for minimum wage and overtime determinations. *Cf. Sandifer v. U.S. Steel Corp.*, 678 F.3d 590, 592 (7th Cir. 2012), *aff'd*, 134 S. Ct. 870 (2014) (noting that hours worked under FLSA—*i.e.*, compensable time—is "the time during which an employee is entitled to be compensated at the minimum hourly wage").[3]

To state a FLSA claim under the workweek averaging approach, then, the plaintiffs must plausibly allege at least one workweek for which the compensation they received, divided by their total compensable time, failed to meet the FLSA minimum wage of $7.25 per hour. They have not done so. As an initial matter, the Amended Complaint does not even include any of the named plaintiffs' hourly wages or any examples of the total compensation they received for any workweek. As to Stover and Sze, the Amended Complaint also lacks any allegations concerning the number of hours worked in any given week. Without such information, it is impossible to determine whether their compensation violated the minimum wage provision of the FLSA. Although the Amended Complaint asserts that Stover and Sze did not receive compensation for all the hours they work, as already explained, that is insufficient to state a FLSA violation. Stover and Sze have, thus, failed to plead facts showing that SkyWest failed to compensate them in accordance with the FLSA minimum wage provisions; the motion to dismiss is granted without prejudice as to these claims.

With respect to Hirst, based on the hourly wage chart in the Policy Manual attached to

---

[3] SkyWest is not, as the plaintiffs argue, making a *de minimus* argument regarding all time FAs work other than block time. *See* Resp. 13-14. SkyWest includes every hour of Hirst's example duty days as compensable time in their calculations of her average weekly wage. *See* Mem. in Supp. 7 and n.3.

the Amended Complaint and the two examples of pairing details, the defendants piece together Hirst's likely compensation for the two example pairings (assuming, as the plaintiffs assert, that each hour of the duty day was "compensable"):

Example 1: October 30, 2012 – November 2, 2012:

| | |
|---|---|
| Credit Time:[4] | 19 hours, 10 minutes |
| x Hourly Rate: | $22.49 |
| Total Compensation: | $431.06 |
| ÷ Total Duty Time:[5] | 33 hours, 44 minutes |
| **Hourly Compensation:** | **$12.78** |

Example 2: December 21, 2014 – December 24, 2014:[6]

| | |
|---|---|
| Credit Time: | 24 hours, 55 minutes |
| x Hourly Rate:[7] | $22.49 |
| Total Compensation: | $560.38 |
| ÷ Total Duty Time: | 37 hours, 48 minutes |
| **Hourly Compensation:** | **$14.82** |

*See* Am. Compl. Figs. 1, 3.[8]

---

[4] In both examples, Hirst would have been paid for credit time rather than block time (assuming she submitted the payroll correction forms), as it was the longer of the two periods. *See* Am. Compl. ¶¶ 25-26; Figs. 1, 3.

[5] The four duty days in this pairing lasted: (1) 6 hours and 24 minutes; (2) 8 hours and 34 minutes; (3) 11 hours and 57 minutes; and (4) 6 hours and 49 minutes, for a total of 33 hours and 44 minutes. *See* Am. Compl. Fig. 1.

[6] The Court's calculations differ from the defendants' in the second example. The Court used credit time, which exceeded block time, to calculate Hirst's total compensation. Additionally, the Court's calculation of Hirst's total duty time is 37.8 hours (duty day totals: (1) 9 hours and 23 minutes; (2) 14 hours and 49 minutes, (3) 5 hours and 1 minute; and (4) 8 hours and 35 minutes, for a total of 37 hours and 48 minutes), rather than 37.865 hours. *See* Mem. in Supp. 7 n.3; Am. Compl. Fig. 3. The defendants' calculations result in an average weekly wage of $13.74 per hour, still far above the federal minimum wage of $7.25. *See* Mem. in Supp. 7 n.3.

[7] SkyWest applied Hirst's hourly rate as of 2012, which likely would have increased by 2014 as she had an additional two years of experience and as the hourly wage chart in the Policy Manual included a 1% increase in rate per year for 2010-2012. *See* Mem. in Supp. 7 n.3; Ex. 2 2327.

[8] The defendants note that they did not include the $1.80 hourly per diem in their calculation of Hirst's compensation. *See* Mem. in Supp. 7 n.2.

Applying the workweek averaging approach to each example pairing, Hirst received average hourly wages of $12.78 and $14.82, respectively, well over the federal minimum wage of $7.25 per hour. While it is possible that over the course of their tenure with SkyWest the plaintiffs worked one or more series of lengthy duty days due, not to long flights (for which time they would have been compensated) but to delay and or/mechanical issues (for which time they would not have been compensated) and, as a result, received only the minimum guaranteed four hours of block time pay each day—resulting in a workweek average below the federal minimum wage. That such a scenario could possibly occur under SkyWest's compensation scheme, however, is insufficient to state a plausible claim; the plaintiffs have not provided a single instance where SkyWest failed to pay an FA the minimum wage as mandated under federal law over the course of a workweek. As such, Hirst's FLSA claim, like those of Stover and Sze, is dismissed without prejudice.[9]

## II.     IMWL Claims

The plaintiffs also assert wage and overtime pay claims under the IMWL. These claims suffer from the same failure to plead inadequate compensation over the course of a workweek. Beyond that shortcoming, which in theory can be corrected, the plaintiffs' IMWL claims suffer from several other defects that cannot be remedied.

### A.     Pleading Deficiencies

The IMWL promises Illinois workers a higher minimum wage than does federal law. The IMWL requires that "every employer shall pay to each of his or her employees who is 18 years of age or older in every occupation wages of not less than $8.25 per hour." 820 Ill. Comp. Stat.

---

[9] The plaintiffs do not dispute the hourly wage SkyWest attributed to Hirst or the calculated total compensation for the example workweeks based on that hourly wage; in fact, the plaintiffs do not respond at all to the specific mathematical calculations of Hirst's average hourly wage or SkyWest's arguments for dismissal based thereon.

105/4(a)(1). When interpreting the IMWL, courts look to the FLSA for guidance. *See Mitchell v. JCG Indus., Inc.*, 745 F.3d 837, 846 (7th Cir. 2014) (citing *Lewis v. Giordano's Enterprises, Inc.*, 921 N.E.2d 740, 745-46 (Ill. App. Ct. 2009); *Bernardi v. Village of North Pekin,* 482 N.E.2d 101, 102 (Ill. App. Ct. 1985)); *see also* 56 Ill. Admin. Code § 210.120 (referring to the FLSA for guidance interpreting the IMWL). For the same reasons their FLSA minimum wage claims are dismissed—failure to plead any facts indicating they received less than minimum wage in any given workweek—Stover and Sze's IMWL minimum wage claims must be dismissed. Applying the workweek averaging approach to Hirst, her average hourly wages of $12.78 and $14.82 exceed the Illinois minimum wage of $8.25; accordingly, her IMWL minimum wage claim fails. *See Gatto v. Mortgage Specialists of Illinois, Inc.*, 442 F. Supp. 2d 529, 537 n.5 (N.D. Ill. 2006) (applying workweek averaging approach to determine compliance with the FLSA and the IMWL); *Ladegaard v. Hard Rock Concrete Cutters, Inc.*, No. 00 C 5755, 2004 WL 1882449, at *5 (N.D. Ill. Aug. 18, 2004) (same).

The IMWL overtime claims fail for the same reason:[10] the plaintiffs have failed to plead any facts showing that they worked over 40 hours in one week and were not compensated at one and one half times their hourly rate for the additional hours. *See* 820 Ill. Comp. Stat. 105/4a(1). There are no allegations that Stover worked overtime. *See* Am. Compl. ¶¶ 102-106. Although the Amended Complaint includes allegations that Sze worked overtime, it also states that she was paid "one and one-half times her regular pay" for that overtime work. Am Compl. ¶ 109. The general allegation regarding overtime—"SkyWest FAs are not paid a higher rate of pay for hours worked over 40 hours per week," Am. Compl. ¶ 148—is inconsistent with the statement that FAs are paid time and a half whenever they are junior manned, which the Amended Complaint

---

[10] The plaintiffs only bring an overtime claim under the IMWL, as FAs are exempt from the overtime provision of the FLSA. *See* 29 USC § 213(b)(3).

defines as having voluntarily accepted an overtime shift. *See* Am. Compl. ¶ 80(C) and n.6. The Policy Manual further explains that when SkyWest assigns an FA a pairing on a scheduled day off or requires that an FA is junior manned, she is compensated at time and a half. *See* Am. Compl. Ex. 2 §§ 2305, 2308.20. That Sze only received one and one-half times her regular pay when she was junior manned—*i.e.*, worked overtime—does not state a violation of the IMWL overtime provision; rather, it acknowledges that she was paid time and a half when she worked overtime.

With respect to Hirst, and extrapolating from the pairing details she provides, the plaintiffs argue, "Depending on the start and finish day of the workweek, [Hirst] is likely to have . . . exceeded the 40 hours required under the IMWL." Resp. 17 n.15. That there is a possibility that Hirst had a workweek exceeding 40 hours (and that she was not paid time and a half for the additional hours) is insufficient to satisfy Rule 8 and the plausibility standard of *Twombly* and *Iqbal*. *See Iqbal,* 556 U.S. at 678 ("The plausibility standard is not akin to a 'probability requirement,' but it asks for *more than a sheer possibility* that a defendant has acted unlawfully." (emphasis added)). Hirst has access to at least some of her pairing details;[11] if there is a workweek in which she worked over 40 hours and was not compensated accordingly, she is able to identify those facts. *See Runnion ex rel. Runnion v. Girl Scouts of Greater Chicago & Nw. Indiana*, 786 F.3d 510, 528 (7th Cir. 2015) ("[P]laintiffs' 'pleading burden should be commensurate with the amount of information available to them.'"). Because none of the plaintiffs has alleged a single workweek in which she worked any overtime hours that were not

---

[11] The Amended Complaint notes that, although pairing details are available for at least five years on the SkedPlus+ system, the information is only accessible to employees of the airline. Am. Compl. ¶ 12. Nonetheless, the plaintiffs have at least two of Hirst's pairing details, which they include in the Amended Complaint. There is no explanation of how they were able to access these two pairing details and whether they have access to additional examples.

compensated at a time-and-a-half rate, they have failed to state a plausible IMWL overtime claim.

The plaintiffs' attempt to invoke the IMWL, moreover, cannot be cured simply by pleading that the plaintiffs worked so much that they were paid less than minimum wage or qualified for overtime. A claim based on the IMWL must be based on work performed in Illinois. "Because the IMWL is designed to protect employees within the State of Illinois only, it does not apply extraterritorially," meaning it only protects employees located within Illinois and only applies to conduct occurring in Illinois. *Wooley v. Bridgeview Bank Mortgage Co., LLC*, No. 14 C 5757, 2015 WL 327357, at *2, *3 (N.D. Ill. Jan. 23, 2015). State laws—federal laws, too, for that matter—presumptively lack extraterritorial reach. "When a statute gives no clear indication of an extraterritorial application, it has none." *Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 255 (2010); *Avery v. State Farm Mut. Auto. Ins. Co.*, 835 N.E.2d 801, 852 (Ill. 2005) ("the long-standing rule of construction in Illinois" is "that a statute is without extraterritorial effect unless a clear intent in this respect appears from the express provisions of the statute") (internal quotation omitted). Thus, to state a claim under the IMWL, the plaintiffs must not only allege that they were not adequately compensated for hours worked in a given workweek but also must allege that the plaintiffs worked those hours in Illinois. *Cf. Glass v. Kemper Corp.,* 133 F.3d 999, 1000 (7th Cir. 1998) (holding that Illinois Wage Payment and Collection Act did not apply where the plaintiff's work was outside the state).[12] The plaintiffs' Amended Complaint fails to

---

[12] The Illinois Department of Labor has similarly construed the IWPC to apply only to work performed within Illinois. *See https://www.illinois.gov/idol/FAQs/Pages/wage-payment-faq.aspx* ("The work has to be performed in Illinois for an employee to make a claim under the Act. For example, a truck driver that lives in Illinois but travels throughout the United States to perform their work is likely not covered by the Act.") (last visited May 23, 2016).

do so, and likely cannot because there is no identified basis by which the work of FAs performed within the territorial jurisdiction of the state of Illinois (or any other state) was measured.[13]

B.     **SkyWest's "Jurisdictional" Arguments**

In addition to its arguments based on the plaintiffs' failure to allege facts sufficient to plausibly establish violations of the IMWL, SkyWest also asserts that the IMWL claims must be dismissed pursuant to Rule 12(b)(1) because the Court lacks jurisdiction over those claims. SkyWest maintains that the IMWL claims are barred by the dormant Commerce Clause and are preempted by Congress's occupation of the field of regulation relating to air travel, by its enactment of the Aviation Deregulation Act ("ADA"), and by the Railway Labor Act ("RLA"). Whatever the substantive merit of these arguments (considered below), neither the Commerce Clause nor any of the preemptive acts asserted by SkyWest deprive the court of jurisdiction to adjudicate the plaintiffs' state law claims.

As used in Rule 12(b)(1), "jurisdiction" refers to a court's authority to adjudicate a claim. Here, SkyWest is not really arguing that the Court cannot adjudicate the IMWL claim. Its argument is that the claim must fail in this or any other court based on the substantive content and effect of federal law (specifically, the Commerce Clause, the Federal Aviation Act, the ADA, and the RLA). To do what SkyWest urges here—to apply federal law, whether constitutional or statutory, to defeat a state law claim—is to exercise, not abdicate, judicial authority. A party's assertion of the dormant Commerce Clause does not deprive the court of jurisdiction; it asks the court to apply federal law to defeat the claim that the party is liable under

---

[13] To track hours worked within a particular state, moreover, another problem would have to be addressed. On what basis would work at 35,000 feet constitute work within the state of Illinois? The state has no sovereignty over the skies above it. There is no "State of Illinois" airspace, only national airspace. *See* 49 U.S.C. § 40103(a) ("The United States Government has exclusive sovereignty of airspace of the United States."). Arguably, then, virtually none of the flight time worked by the plaintiffs can be said to have occurred within Illinois.

state law. The long line of cases in which the Supreme Court has held the dormant Commerce Clause to invalidate applications of state law would not exist if federal courts had no "jurisdiction" over cases in which defendants invoke that constitutional provision. *See, e.g., Comptroller of Treasury of Maryland v. Wynne*, 135 S. Ct. 1787, 1799 (2015) ("Legion are the cases in which we have considered and even upheld dormant Commerce Clause challenges brought by residents to taxes that the State had the jurisdictional power to impose."); *Camps Newfound/Owatonna, Inc. v. Town of Harrison, Maine*, 520 U.S. 564, 575-76 (1997) (invalidating higher state tax on charities conducted principally for the benefit of non-residents as a violation of the Commerce Clause). So, too, with preemption doctrine; the assertion that federal law preempts state law does not mean that the court has no jurisdiction over the state law claim; it means that the state law claim must fail on the merits. *See, e.g.*, *Healy v. Metro. Pier & Exposition Auth.*, 804 F.3d 836, 840-41 (7th Cir. 2015) ("we deem a dismissal of preempted state law claims a 12(b)(6) dismissal for failure to state a claim, a dismissal on the merits"); *Turek v. Gen'l Mills, Inc.,* 662 F.3d 423, 425 (7th Cir. 2011) ("the fact that a defendant has a good [preemption] defense to a state law claim does not mean that the complaint does not invoke federal jurisdiction").

It would be ironic, indeed, if the assertion of a constitutional or statutory provision, or an argument that an act of Congress has preemptive effect—both essentially assertions of the Supremacy Clause of the Federal Constitution—divested federal courts of subject matter jurisdiction over state law claims that were otherwise properly before the court. This Court has supplemental jurisdiction—the authority to adjudicate—over the plaintiffs' IMWL claims pursuant to 28 U.S.C. § 1367 because they are joined with the plaintiffs' federal FLSA claim. SkyWest's assertion of defenses founded on federal law, constitutional and statutory, are

properly before the Court. For the reasons already noted, and those that follow, those state law claims must be dismissed, but not because this Court lacks jurisdiction to adjudicate them.

### C. Commerce Clause

SkyWest argues that requiring a national airline to comply with the IMWL is a substantial burden that violates its right to engage in interstate commerce. The Commerce Clause both affirmatively grants power to Congress to regulate interstate commerce but also implies a negative converse—"a substantive 'restriction on permissible state regulation' of interstate commerce." *Dennis v. Higgins*, 498 U.S. 439, 447 (1991) (quoting *Hughes v. Oklahoma,* 441 U.S. 322, 326 (1979)); *see also S.-Cent. Timber Dev., Inc. v. Wunnicke*, 467 U.S. 82, 87 (1984) ("[T]he Clause has long been recognized as a self-executing limitation on the power of the States to enact laws imposing substantial burdens on such commerce."). This negative implication— that states may not take actions that unduly interfere with the affirmative power of the federal government to regulate interstate commerce—is generally known as the "dormant Commerce Clause." *See, e.g.*, *CTS Corp. v. Dynamics Corp. of America*, 481 U.S. 69, 87 (1987) ("The principal objects of dormant Commerce Clause scrutiny are statues that discriminate against interstate commerce.").

In considering whether a state regulation violates the Commerce Clause, a court first determines if the regulation directly discriminates against interstate commerce or has the effect of favoring in-state economic interests; if so, the state regulation is generally struck down. *See Brown-Forman Distillers Corp. v. New York State Liquor Auth.*, 476 U.S. 573, 578-79 (1986); *see also Nat'l Solid Wastes Mgmt. Ass'n v. Meyer*, 63 F.3d 652, 657 (7th Cir. 1995). If the state regulation is neutral on its face or only has indirect effects on interstate commerce, the regulation "will be upheld 'unless the burden imposed on such commerce is clearly excessive in relation to

the putative local benefits.'" *Nat'l Solid Wastes*, 63 F.3d at 657 (quoting *Pike v. Bruce Church, Inc.,* 397 U.S. 137, 142 (1970)).

For example, in *Bibb v. Navajo Freight Lines*, 359 U.S. 520 (1959), an Illinois statute required truckers to use a specific mudguard while operating on Illinois highways—a mudguard not in common use and that, if used on other states' highways, would violate their mudguard statutes. *Id.* at 522-23. Although Illinois had a significant interest in regulating safety on its highways, the Supreme Court held that the Illinois statute placed an undue burden on interstate commerce. *Id.* at 529. The Court expressed the importance of national uniformity in certain fields—"this regulation of mudguards is not one of those matters 'admitting of diversity of treatment, according to the special requirements of local conditions' . . . ." *Id.* (quoting *Sproles v. Binford*, 286 U.S. 374, 390 (1932)).

The same principle of national uniformity is applicable to the airline industry. *See United Air Lines, Inc. v. Indus. Welfare Comm'n*, 28 Cal. Rptr. 238, 248 (Dist. Ct. App. 1963) *disapproved of on other grounds by Indus. Welfare Com. v. Superior Court*, 613 P.2d 579 (Cal. 1980); *see also Sompo Japan Ins., Inc. v. Nippon Cargo Airlines Co.*, 522 F.3d 776, 779 (7th Cir. 2008) (a goal of the Warsaw Convention was to create "uniformity in the aviation industry"); *Am. Airlines, Inc. v. Wolens*, 513 U.S. 219, 232-33 (1995) (noting the Airline Deregulation Act preemption provision promotes national uniformity); *Schultz v. United Airlines, Inc.*, 797 F. Supp. 2d 1103, 1106 (W.D. Wash. 2011) (same); *Howell v. Alaska Airlines, Inc.*, 994 P.2d 901, 904 (Wash. Ct. App. 2000) (same).

Here, the IMWL provisions would only apply to FAs based in Illinois and only to the hours they worked in Illinois. *See Wooley*, 2015 WL 327357, at *2, *3. To calculate the time the plaintiffs worked to which the IMWL would apply, SkyWest would have to track each minute

pre- or post-flight in Illinois and the amount of turn time between flights that FAs spent in Illinois.[14] Moreover, if the IMWL were applicable to SkyWest FAs, then every state's comparable laws would also apply, subjecting SkyWest to 50 or more regulations depending where each FA was physically located at a particular moment in time.[15] Requiring compliance with the IMWL would not be a simple matter of setting an FA's minimum wage at the statutory amount in the state in which she is based; it would impose a labyrinth of potentially conflicting wage laws upon FAs based out of different states and cities, working on the same flights, literally moving through interstate commerce on a daily basis. This is precisely the type of burden on interstate commerce that the Commerce Clause prohibits. *See Fitz-Gerald v. Skywest Airlines, Inc.*, No. 01129514, 2005 WL 3118764, at *1-2 (Cal. Sup. Ct. Oct. 13, 2005), *aff'd*, 65 Cal. Rptr. 3d 913 (Ct. App. 2007);[16] *cf. Mitchell v. Abercrombie & Fitch*, No. C2-04-306, 2005 WL 1159412, at *4 (S.D. Ohio May 17, 2005) (Commerce Clause prevented application of Ohio minimum wage law to Ohio-based employer for all employees throughout the country).

---

[14] As noted *infra*, it might be argued that the IMWL does not apply to any portion of the time FAs spend in flight over the state of Illinois because that airspace is not within the state's sovereignty. But if it does, the complexity and burdens that would attend its application to FAs would only strengthen the argument for applying the Commerce Clause to bar its application. To include flight time over the state, SkyWest would be required to determine the precise minute each flight crossed into and out of Illinois airspace and whether any FA on that particular flight was based in Illinois. If changing a mudguard at the state line is a substantial burden on interstate commerce, then so, too, is tracking the minute-by-minute location of each FA on each operating SkyWest flight to determine the precise moment she enters and exits Illinois airspace.

[15] SkyWest highlights the plaintiffs' reference to pending minimum wage legislation in the City of Chicago, alluding to the potential for SkyWest to be subject to the minimum wage laws of every city through which SkyWest flies. Mem. in Supp. 15 n.8; *see also* Am. Compl. ¶ 147.

[16] The plaintiffs object to SkyWest's reliance on *Fitzgerald*, which the California Supreme Court disapproved of in certain respects in *People ex rel. Harris v. Pac Anchor Transp., Inc.*, 329 P.3d 180, 187-89 (Cal. 2014). The portion of the opinion addressing the Commerce Clause arguments, however, remains good law.

The plaintiffs' only response to the Commerce Clause argument (relegated to a footnote in their response) notes that wage regulation is a "historic police power[ ] of the States," not the federal government. Resp. 19 n.16. SkyWest's invocation of the Commerce Clause, however, is not in the context of whether an action is a permissible federal regulation but rather references the Clause's "implicit restraint on state authority." *United Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 550 U.S. 330, 338 (2007). Moreover, the state mudguard regulation in *Bibb* was also passed under Illinois's police power; nonetheless, the Supreme Court held it an undue burden on interstate commerce. *See id.* 359 U.S. at 529-30. The same is true here.

Imposing the IMWL on SkyWest would be an undue burden on interstate commerce and would upend the uniform treatment of FAs across states (and across the airline industry). Repleading, moreover, will not change this fact. Accordingly, the plaintiffs' IMWL claims are dismissed with prejudice.

### B.     Preemption Arguments

SkyWest makes three additional arguments, asserting that a myriad of federal laws preempt the application of the IMWL to the airline industry. None of these arguments—field preemption, enactment of the ADA or the RLA—preempt the application of the IMWL, a generally applicable state law governing the conditions of the workplace, to SkyWest.

### 1.     Field Preemption

SkyWest asserts that because Congress has so heavily regulated the airline industry, federal law preempts the entire field of aviation, preventing states from supplementing with their own wage regulations. "Issues of express or field preemption are generally purely legal questions, where the matter can be resolved solely on the basis of the state and federal statutes at

issue." *Wisconsin Cent., Ltd. v. Shannon*, 539 F.3d 751, 759 (7th Cir. 2008). There is a presumption against preemption in areas of law traditionally occupied by the states—such as wage regulation—unless federal preemption was "the clear and manifest purpose" of Congress. *Wyeth v. Levine*, 555 U.S. 555, 565 (2009); *see also California Div. of Labor Standards Enf't v. Dillingham Const., N.A., Inc.*, 519 U.S. 316, 330 (1997) (wage regulation a field traditionally occupied by the states). The defendants focus on *Wisconsin Central, Ltd. v. Shannon*, in which the Seventh Circuit held overtime claims under the IMWL preempted due to comprehensive federal legislation over the railway industry. 539 F.3d at 765. SkyWest asks this Court to extend the holding of *Wisconsin Central* to the airline industry.

To reach its conclusion that federal law preempted the IMWL overtime provision for railroad employees, the Seventh Circuit reviewed the breadth of federal regulation over railways, noting that it has "touched on nearly every aspect of the railway industry, including property rights, shipping, labor relations, hours of work, safety, security, retirement, unemployment, and preserving the railroads during financial difficulties." *Id*. at 762. With respect to wage laws, however, the court observed the lack of comparable federal regulation but noted, "'[w]here a comprehensive federal scheme intentionally leaves a portion of the regulated field without controls, then the pre-emptive inference can be drawn—not from federal inaction alone, but from inaction joined with action.'" *Id*. at 764 (quoting *Puerto Rico Dep't of Consumer Affairs v. Isla Petroleum Corp.,* 485 U.S. 495, 503 (1988)). The action predating congressional inaction in the railway industry was the Adamson Act, which, to head off an impending national strike, permanently established an eight-hour workday for determining the compensation of railroad employees and temporarily froze wages. *Wisconsin Central*, 539 F.3d at 764 (citing the Adamson Act of 1916, 39 Stat. 721 (codified as amended at 49 U.S.C. § 28301)). The Seventh

Circuit concluded that the congressional intent to keep railroad wage negotiations free from regulations preempted state attempts to impose such wage regulations. *Wisconsin Central*, 539 F.3d at 765.

Here, too, Congress has enacted regulations touching on numerous aspects of the airline industry, including labor relations (45 U.S.C. §§ 181-188), maximum work hours and employee rest requirements (14 CFR Parts 1-199), safety and security (49 U.S.C. §§ 44101, *et seq*.; 49 C.F.R. Parts 1500-1699), design standards (49 U.S.C. § 44701), marketing and pricing (49 U.S.C. § 41701, *et seq*.), among many others. *See* Reply 10 n.6. Where the comparison between the railway and airline industries diverges, however, is the congressional expression of clear and manifest intent to preempt state wage regulations. Unlike *Wisconsin Central*, where the court identified congressional intent to foster wage negotiations free from regulation, with respect to the airline industry, there is simply a lack of federal regulation: "the mere absence of federal legislation with respect to [minimum and] overtime wages is not enough to find a congressional intent to preempt this field, since '[t]here is no federal pre-emption in vacuo, without a constitutional text or a federal statute to assert it.'" 539 U.S. at 764 (quoting *Isla Petroleum Corp.,* 485 U.S. at 503). Without congressional intent to preempt state wage laws—a regulatory area traditionally occupied by the states—either through action or inaction, the presumption against preemption applies.

### 2.      Airline Deregulation Act

In 1978, Congress, "determining that 'maximum reliance on competitive market forces' would best further 'efficiency, innovation, and low prices' as well as 'variety [and] quality . . . of air transportation services,' enacted the Airline Deregulation Act." *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 378 (1992) (quoting 49 U.S.C. §§ 1302(a)(4), 1302(a)(9)) (brackets

and ellipses in original). To ensure that states did not attempt to regulate the airline industry, undoing the effects of the ADA, the Act includes a preemption provision "prohibiting the States from enforcing any law 'relating to rates, routes, or services' of any air carrier." *Morales*, 504 U.S. at 378-79 (quoting § 1305(a)(1)).[17] The Supreme Court broadly interprets this preemption provision, but has noted that "'[s]ome state actions may affect [airline fares] in too tenuous, remote, or peripheral a manner' to have pre-emptive effect." *Morales*, 504 F.3d at 390.

The Seventh Circuit has articulated two requirements for a state law to be expressly preempted by the ADA: "(1) A state must 'enact or enforce' a law that (2) 'relates to' airline rates, routes, or services, either by expressly referring to them or by having a significant economic effect upon them." *Travel All Over the World, Inc. v. Kingdom of Saudi Arabia*, 73 F.3d 1423, 1432 (7th Cir. 1996) (ADA preempted intentional tort claims stemming from a method of ticketing but not breach of contract, slander, or defamation claims). To make the preemption determination, the court must consider the particular facts of the case and determine whether the claims "relate to" airline rates, routes, or services. *Id*. at 1433.

Here, the IMWL claims are for violations of the Illinois minimum wage and overtime provisions. SkyWest asserts that the ADA preempts these claims because, "[t]o comply, SkyWest would have to redesign the crew compliments, routes and stage lengths (impacting routes and services), which impermissibly impacts the rates charged to the public." Mem. in Supp. 15. The plaintiffs argue that if the ADA preempts Illinois wage laws "'because they might indirectly impact [the Defendants'] prices and rates [that] is tantamount to arguing immunity from all state economic regulation.'" Resp. 19 (quoting *Costello v. BeavEx Inc*., 303 F.R.D. 295,

_____

[17] The ADA was revised in 1994 and renumbered in the United States Code: the preemption provision is now 49 U.S.C. § 41713. *See* Act of July 5, 1994, Pub. L. No. 103–272, 108 Stat 745.

303 (N.D. Ill. 2014), *partially aff'd, vacated and remanded on other grounds*, 810 F.3d 1045 (7th Cir. 2016)).

Like the bribery and racketeering claims at issue in *S.C. Johnson & Son, Inc. v. Transport Corp. of America*, 697 F.3d 544 (7th Cir. 2012), however, Illinois's wage laws are "state laws of general application that provide the backdrop for private ordering." *Id.* at 558. These laws have incidental effect on "transportation companies (whether air or surface carriers) only in their capacity as members of the public." *Id.* (citing *Rowe*, 552 U.S. at 375). The Seventh Circuit noted that "no one thinks that the ADA or the FAAAA preempts these and the many comparable state laws, [such as minimum wage laws], because their effect on price is too 'remote.'" *S.C. Johnson*, 697 F.3d at 558 (citing *Californians For Safe & Competitive Dump Truck Transp. v. Mendonca,* 152 F.3d 1184, 1189 (9th Cir. 1998) (FAAAA does not preempt minimum wage laws)).

The IMWL is not "related to" airline rates, routes, or services; any effect on SkyWest is incidental and no different than on any other employer. *See Costello*, 810 F.3d at 1055-56 (FAAAA did not preempt Illinois wage deduction law); *Valencia v. SCIS Air Sec. Corp.*, 193 Cal. Rptr. 3d 775, 779-82 (Ct. App. 2015) (ADA did not preempt state labor laws on meals, rest breaks, and wages); *see also DiFiore v. Am. Airlines, Inc.*, 646 F.3d 81, 89 (1st Cir. 2011) ("We do not endorse American's view that state regulation is preempted wherever it imposes costs on airlines and therefore affects fares . . . This would effectively exempt airlines from state taxes, state lawsuits of many kinds, and perhaps most other state regulation. . . ."). Thus, the ADA does not preempt the plaintiffs' IMWL claims.

### 3. Railway Labor Act

SkyWest also contends that the RLA preempts both the FLSA and IMWL claims. Congress passed the Railway Labor Act, which it extended to cover the airline industry in 1936, *see* Act of Apr. 10, 1936, ch. 166, 49 Stat. 1189; 45 U.S.C. §§ 181-188, to "promote stability in labor-management relations by providing a comprehensive framework for resolving labor disputes." *Hawaiian Airlines, Inc. v. Norris*, 512 U.S. 246, 252 (1994); *see also* 45 U.S.C. § 151a. The RLA includes a mandatory dispute resolution mechanism for two types of disputes: (1) "major" disputes concerning "rates of pay, rules, or working conditions," 45 U.S.C. § 151a, which relate to "'the formation of collective [bargaining] agreements or efforts to secure them,'" *Hawaiian Airlines*, 512 U.S. at 252 (quoting *Consolidated Rail Corporation (Conrail), v. Railway Labor Executives' Assn.,* 491 U.S. 299, 302 (1989)) (brackets in original); and (2) "minor" disputes that "gro[w] out of grievances or out of the interpretation or application of agreements covering rates of pay, rules, or working conditions," 45 U.S.C. § 151a, which involve "controversies over the meaning of an existing collective bargaining agreement in a particular fact situation." *Hawaiian Airlines*, 512 U.S. at 253 (quoting *Trainmen v. Chicago R. & I.R. Co.,* 353 U.S. 30, 33 (1957)). The Supreme Court has described the difference between the two: "'major disputes seek to create contractual rights, minor disputes to enforce them.'" *Hawaiian Airlines*, 512 U.S. at 253 (quoting *Conrail,* 491 U.S. 302).

The RLA preempts a state claim or precludes a federal claim when ""the success of the claim is dependent upon an interpretation of the collective bargaining agreement's terms." *Wisconsin Central*, 539 F.3d at 757 (quoting *Miller v. Am. Airlines, Inc.,* 525 F.3d 520, 524 (7th Cir. 2008)); *see also In re Bentz Metal Prods. Co.,* 253 F.3d 283, 285 (7th Cir. 2001) (holding, with respect to the parallel preemption provision in § 301 of the Labor Management Relations

Act, "that a state law claim is not preempted if it does not require interpretation of the CBA even if it may require reference to the CBA"). Accordingly, there are a number of situations that may involve a CBA that do not result in preemption/preclusion, such as where the interpretation of the contractual provision at issue is not disputed or where reference to the CBA is only necessary to compute damages. *See Wisconsin Central*, 539 F.3d at 758 (collecting cases).

The parties spend a great deal of time debating whether SIA "represents" the FAs, whether the Policy Manual qualifies as a CBA, and, if so, whether any interpretation is necessary to resolve the plaintiffs' claims. *See* Mem. in Supp. 15-18; Resp. 22-23; Reply 13-15. The Supreme Court, however, has held that "substantive protections provided by state law, independent of whatever labor agreement might govern, are not pre-empted under the RLA." *Hawaiian Airlines*, 512 U.S. at 257; *see also Terminal R. Ass'n of St. Louis v. Bhd. of R.R. Trainmen*, 318 U.S. 1, 7 (1943) ("We hold that the enactment by Congress of the Railway Labor Act was not a pre-emption of the field of regulating working conditions themselves."). The claims based on compliance with the FLSA and the IMWL are not disputes seeking to create a contractual right or disputes to enforce a contractual right. Minimum wage and overtime laws are substantive protections the plaintiffs are entitled to, completely independent of a CBA. *See Hawaiian Airlines*, 512 U.S. at (state wrongful discharge law an obligation "[w]holly apart from any provision of the CBA" and not preempted); *Terminal R. Ass'n*, 318 U.S. at 3-4, 6-7 (state law requiring cabooses on all trains for switchman safety not preempted).

Moreover, even assuming the Policy Manual qualifies as a CBA (which the plaintiffs dispute), the defendants have not established that any interpretation would be necessary to resolve the minimum wage and overtime claims. Resolving the FLSA and IMWL claims would "require only the purely factual inquiry into" the hours the plaintiffs worked and the amount they

were compensated. *Hawaiian Airlines,* 512 U.S. at 266; *see also In re Bentz*, 253 F.3d 283, 289 ("[T]he overriding principle is that for preemption to apply, *interpretation* of the CBA and not simply a reference to it is required." (emphasis in original)).

Because the plaintiffs' rights under the FLSA and the IMWL are completely independent of the Policy Manual, and the defendants have not established that any interpretation of the Policy Manual is required to resolve the claims, the RLA does not preempt the plaintiffs' claims.

## III.    Declaratory and Injunctive Relief

The plaintiffs seek declaratory and injunctive relief on behalf of all similarly situated current and former SkyWest FAs. Since all of the plaintiffs' claims are being dismissed, however, the request for such relief is moot. Because the plaintiffs may replead their FLSA claims, however, the court will address the availability of injunctive relief. It is clear that, as former employees, the plaintiffs lack standing to pursue equitable relief. When "seeking injunctive and declaratory relief, a plaintiff must establish that he is in immediate danger of sustaining some direct injury." *Feit v. Ward,* 886 F.2d 848, 857 (7th Cir. 1989). "Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects." *O'Shea v. Littleton,* 414 U.S. 488, 495-96 (1974); *see also Robinson v. City of Chicago*, 868 F.2d 959, 966 n.5 (7th Cir. 1989) (same standard applies to injunctive and declaratory relief).

The plaintiffs argue that, in an employment context, it is "well established" that former employees have standing to represent a class of both former and current employees seeking injunctive and declaratory relief. Resp. 23-24 (citing *Wetzel v. Liberty Mutual Ins. Co*., 508 F.2d 239, 247 (3rd Cir. 1975); *In re FedEx Ground Package Sys., Empl. Practices Litig.*, 273 F.R.D. 424, 438 (N.D. Ind. 2008); *Walker v. Bankers Life & Cas. Co.*, No.: 06 C 6906, 2007 WL

2903180, at *7 (N.D. Ill. Oct. 1, 2007); *Resnick v. American Dental Ass'n*, 90 F.R.D. 530, 540

(N.D. Ill. 1981); *Maddock v. KB Homes, Inc.*, 248 F.R.D. 229, 238 (C.D. Cal 2007)). The cases

the plaintiffs cite, however, all address the issue on a class certification motion, not on a motion

to dismiss. As no class has been certified, at this point the plaintiffs are arguing their individual

claims on the motion to dismiss, not the claims of the proposed class members. For that reason,

the Seventh Circuit's holding in *Feit* is controlling.

Even if it were not, notwithstanding that some courts have held to the contrary, the Court

is not persuaded that the plaintiffs have standing to seek equitable relief even where there is a

putative class that includes current employees. As the Supreme Court has instructed, "[t]hat a

suit may be a class action . . . adds nothing to the question of standing . . . ." *Lewis v. Casey*, 518

U.S. 343, 357 (1996) (quoting *Simon v. Eastern Ky. Welfare Rights Organization,* 426 U.S. 26,

40 n.20 (1976)). Thus—and contrary to the plaintiffs' contention—courts in this district regularly

dismiss putative class actions on standing grounds where the named plaintiffs were former

employees seeking to obtain injunctive and equitable relief on behalf of current employees. *See*

*e.g.*, *Sawyer v. Vivint, Inc.*, 2015 WL 3420615, at *3 (N.D. Ill. May 28, 2015) (former service

technician lacked standing to pursue injunctive relief on behalf of himself and putative class of

current and former employees); *Ruffin v. Exel Direct, Inc.*, No. 09 C 1735, 2009 WL 3147589, at

*3 (N.D. Ill. Sept. 29, 2009) (former contractors, suing on behalf of current and former

contractors, did not have standing to seek the declaratory and injunctive relief); *Brown v. Cty. of*

*Cook*, 549 F. Supp. 2d 1026, 1031 (N.D. Ill. 2008) (same); *Hawkins v. Groot Indus., Inc.*, No. 01

C 1731, 2003 WL 22057238, at *2 (N.D. Ill. Sept. 2, 2003) (the "fundamental reason" why court

could not certify a Rule 23(b)(2) [injunctive] class of present and former black employees was

that neither of the named African-American plaintiffs was a current employee). In this Court's

view, even if *Feit* does not dictate the answer, the better view is that an individual named plaintiff who is not a current employee has no standing to assert claims for prospective injunctive and equitable relief on behalf of current employees.

*       *       *

The motion to dismiss is granted with prejudice as to the IMWL claims and the claims for injunctive and declaratory relief; the motion is granted without prejudice as to the FLSA claims. The plaintiffs' motion to proceed as a collective action, for tolling of the statute of limitations, for court-authorized notice, and for disclosure of the contact information of the potential opt-in plaintiffs is denied as moot. To the extent that the plaintiffs can attempt, in good faith, to cure the deficiencies in their FLSA claims, they may file a Second Amended Complaint within 21 days of this order. In the absence of a timely filed Second Amended Complaint, the FLSA claims, and the case, will be dismissed with prejudice.

Dated: May 24, 2016

John J. Tharp, Jr.
United States District Judge