**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| ANDREA HIRST, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 15-CV-02036 |
| | ) | |
| SKYWEST, INC., et al. | ) | Judge John J. Tharp, Jr. |
| | ) | |
| Defendants. | ) | |

---------------------------------------------------------------------------------------------------------

| | | |
|---|---|---|
| CHERYL TAPP, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 15-CV-11117 |
| | ) | |
| SKYWEST, INC., et al. | ) | Judge John J. Tharp, Jr. |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Surely, you might think, flight attendants—who hold coveted positions that require substantial training in a variety of subjects and are entrusted with helping to ensure the safety of the flying public—earn substantially more than the federal minimum wage of $7.25 per hour. But do they? The plaintiffs in these two cases say no. They are current and former flight attendants ("FAs") for SkyWest Airlines who bring this action on behalf of themselves and all others similarly situated, alleging that SkyWest paid them less than teenagers make flipping burgers at a fast-food joint. The plaintiffs maintain that SkyWest violated a patchwork of federal, state, and local wage and wage statement laws by failing to compensate them for much of the work they perform and for providing them with inadequate information about their pay. The complaints allege that SkyWest's compensation scheme—under which the plaintiffs were paid

not based on total hours worked, but only for the amount of "block time" they worked (basically, the time spent in the airplane with the cabin door closed)—violates the federal minimum wage law[1] and a host of other state and local laws regulating employee compensation.[2] The court dismissed an earlier iteration of this complaint because the plaintiffs could not "provide[] a single instance where SkyWest failed to pay an FA the minimum wage as mandated under federal law over the course of a workweek." *Hirst v. SkyWest, Inc.*, No. 15 C 02036, 2016 WL 2986978, at *5 (N.D. Ill. May 24, 2016) ("*Hirst I*"). SkyWest now moves to dismiss the plaintiffs' amended complaints, which, they maintain, again fail to state a claim for relief. Because not one of the plaintiffs has alleged facts that plausibly show that she or he was *ever* paid less than the federal minimum wage over the course of a work week—and, indeed, the plaintiffs concede their inability to do so—their minimum wage claims cannot get off the ground. And because the state and local laws on which they rely would pose a substantial (impossible, really) compliance burden on SkyWest, they unduly interfere with Congress's regulation of interstate commerce and therefore violate the Dormant Commerce Clause. Accordingly, SkyWest's motion to dismiss the plaintiffs' complaints is granted and these cases are dismissed with prejudice.

---

[1] Part of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 206.

[2] Specifically: California Wage Order No. 9, California Labor Code §§ 201, 202, 203, 204, 226, 1182.12, 1194, and 1194.2, the California Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200 *et seq.*, the San Francisco Minimum Wage Ordinance, San Francisco Admin. Code § 12R, Los Angeles' Living Wage Ordinance, Los Angeles Admin. Code § 10.37 *et seq.*, the Arizona Wage Act, A.R.S. § 23-350, *et seq.*, the Arizona Minimum Wage Act, A.R.S. § 23-363, et seq., the Washington Minimum Wage Act, R.C.W. §§ 49.46.020, 49.46.130, and the Illinois Minimum Wage Law ("IMWL"), § 820 ILCS 105/1 *et seq.*

## I. Background[3]

The two complaints in this case are substantially the same, save the specific allegations pertaining to the individual plaintiffs. To simplify, this opinion will not distinguish between the two, and will cite only to the Hirst's second amended complaint (ECF No. 85 in 15 CV 2036; "*Hirst* Compl.") unless citing to an allegation or statement that is unique to the Tapp amended complaint (ECF No. 73 in 15 CV 11117; "*Tapp* Compl.").

### A.     Flight Attendant Duties, Schedules, and Compensation

The complaints allege that SkyWest uses a computerized scheduling and pay record system called SkedPlus+, which informs FAs of their schedules for the upcoming month just before the month begins. Each monthly schedule includes multiple "pairings," or a one-to-four day series of flights that an FA is assigned to work. FAs are only eligible for time-and-a-half overtime pay if they are "junior manned," which occurs when an FA voluntarily agrees to work an additional pairing that is not on her monthly schedule.

Each FA is based at a particular airport, where their pairings begin and end. SkyWest compensates its FAs using an hourly rate that varies based on the FA's experience. The schedules of SkyWest FAs are recorded down to the minute in the SkedPlus+ system in each shift's "pairing details." *Hirst* Compl. ¶ 30 Fig. 1. The pairing details identify the FA by her employee number and name, and list her base airport, level of training, and position. The details list the FA's "report time"—the time at which she must have arrived at the airport in uniform with all of her mandatory items for duty, cleared security, and checked in electronically on SkyWest's computer system. *Hirst* Compl. ¶ 34. If an FA reports earlier than the start time listed

---

[3] As this is a motion to dismiss, the Court accepts all well-pleaded facts as true and construes all inferences in favor of the plaintiff. *Zemeckis v. Global Credit & Collection Corp.*, 679 F.3d 632, 634 (7th Cir. 2012).

on the pairing details, the required time rather than the actual report time is recorded. Once an FA checks in with SkyWest, she can be rerouted so the airline can avoid delays.

FAs are not paid their hourly rate for each hour worked between their initial arrival at their base airport and their departure at the end of a pairing. Instead, SkyWest pays FAs their hourly rate only for the greater of "block time"—that is, the actual time between when each flight in a pairing leaves a gate and when the main cabin door opens at its destination gate—or "credit time," the amount of time SkyWest estimates it will take to go from gate-to-gate.[4] *Hirst* Compl. ¶¶ 40-41. SkyWest nonetheless tracks—and SkedPlus+ records show—each FA's "duty day," or the period each day between the time an FA is required to be present at an airport in the morning and fifteen minutes after the main cabin door opens on her final flight of the day. *Hirst* Compl. ¶¶ 40-41. Portions of an FA's duty day—such as layover time—are, therefore, not included in an FA's compensated block time.

An FA's duties also include a number of tasks that are not included in the duty day, including reviewing training materials, deplaning passengers over fifteen minutes after the final flight of the day has arrived at the gate, waiting during delays related to gate-checked baggage, international customs requirements, and mechanical issues after the final flight of the day, writing reports concerning irregular operations, and complying with mandatory drug screenings. Moreover, FAs must clear airport security each morning prior to the beginning of their shift. Since January 2014, FAs have also been required to check in with gate agents prior to their scheduled departure, which may require additional uncompensated time, based on the size and

---

[4] SkyWest also pays FAs a small, untaxed hourly *per diem* of $1.80 for their "Time Away from Base," which includes all time that an FA is working or on layover. *Hirst* Compl. ¶ 65. The plaintiffs insist that this payment should not be included in the calculation of their wages and SkyWest does not contend otherwise, so the *per diem* payments do not factor into the court's analysis.

configuration of the airport. The amount of time spent on these activities ranges from minutes to hours per day. SkyWest has no system in place to ensure that the wages it pays comply with federal, state, and local minimum wage laws.

SkyWest compensates FAs for certain training activities at half of an FA's typical hourly rate. FAs are not compensated, however, for the actual amount of time that it takes them to complete the training; instead, they are paid half-wages for an amount of time that SkyWest preordains for each training session. For example, if SkyWest sets a particular training session at eight hours, but an FA takes ten hours to complete the training, the FA is still only compensated for eight hours. Moreover, instead of indicating that FAs are paid half-wages for time spent training, the wage statements SkyWest provides to FAs indicate that FAs trained for half the time allotted by SkyWest. For example, if an FA with a wage rate of $20 per hour completes an eight hour training session, her pay statement indicates that she trained for four hours at a rate of $20 per hour; in reality, the FA trained for eight hours at a rate of $10 per hour.

SkyWest employees have access to their SkedPlus+ records, which detail the total amount of duty time as well as the total time for which they are paid their hourly wage for each day of a shift. The SkedPlus+ records do not total the amount of duty time an FA worked during a pairing, so to deduce her total duty time, an FA must add the duty time listed for each day of the pairing as well as any hours she worked outside of her duty time. The SkedPlus+ records do note the total "Time Away From Base" for a pairing, that is, the total amount of time working or on layover during a multi-day shift. *Hirst* Compl. ¶ 30 Fig. 1. When an employee leaves SkyWest, she loses access to her SkedPlus+ records, and as a matter of course, SkyWest declines to provide SkedPlus+ records to former employees who request them. In contrast to SkedPlus+ records, the wage statements provided to SkyWest FAs list only block hours—the time for which

an FA is paid their hourly wage. The wage statements do not include the total duty time an FA has worked during a pay period, nor do they include an accounting of the time an FA has worked outside her block duty hours.

### B. Plaintiff Specific Facts

The complaints set forth specific facts as to each plaintiff's experience with SkyWest, presumably intended to demonstrate that there were periods when each of them was not compensated at or above the federal minimum wage.

#### 1. Andrea Hirst

Andrea Hirst worked as an FA for SkyWest for over five years (though she does not tell us over what specific period, an omission that obscures her block-time wage rate for some portions of her employment). For almost all of that time, she was based at Chicago O'Hare International Airport. During a pairing in December 2014, due to an incoming aircraft arrival delay, Hirst's block time did not begin until approximately 6.5 hours after her report time. On that day, she received her hourly block-time wage (at that time, $22.49) for only 7 hours and 48 minutes, although her duty day was 14 hours and 49 minutes. Aside from holiday pay, Hirst only received time-and-a-half wages once, when she was "junior manned." Hirst regularly worked hours that were not part of her duty day preparing irregular operations reports, reading training materials, and arriving early at the airport due to the unpredictability of security at O'Hare. Hirst also regularly took more than the allotted time to complete compensated online training sessions, but was only compensated for the time allotted by SkyWest.

#### 2. Molly Stover

Molly Stover worked as an FA for SkyWest for over two years and was exclusively based out of O'Hare. On multiple pairings, Stover's flights were delayed and she was not

compensated (aside from the small per diem) for the extra time she spent working as a result. Stover never received time-and-a-half pay. Stover regularly worked hours that were not part of her duty day preparing irregular operations reports, reading training materials, and arriving early at the airport due to the unpredictability of security at O'Hare. For the pay period lasting from October 1 to October 15, 2012, Stover was paid $656.25 for 86.07 hours of duty time. Her actual hourly rate of pay for this period was $7.62 per hour. At least once, Stover took more than the allotted time to complete compensated online training sessions, but was only compensated for the time allotted by SkyWest.

### 3. Emily Stroble Sze

Emily Stroble Sze worked as an FA for SkyWest for over two years and was based out of O'Hare for all but three months of her tenure. Sze regularly worked hours that were not part of her duty day preparing irregular operations reports, reading training materials, and arriving early at the airport due to the unpredictability of security at O'Hare.

### 4. Cheryl Tapp

Cheryl Tapp is the only plaintiff who continues to be employed by SkyWest. Tapp has been an FA for SkyWest for more than five years and has been based in San Francisco and Los Angeles in that time. Tapp received time-and-a-half pay 11 times, when she was junior manned. During the week of January 7-13, 2013, Tapp worked 62.65 duty hours and was paid at an effective rate of $15.47 per hour, not factoring in any hours she may have worked outside her duty days. During the week of April 9-14, 2013, Tapp worked 51.13 hours at an effective rate of $13.49 per hour, again not factoring in hours worked outside duty days.

### 5. Renee Sitavich

Renee Sitavich worked as an FA for SkyWest for over eight years, initially based at O'Hare before she transferred to San Francisco. On September 9, 2013, Sitavich had a duty day of 11 hours and 1 minute but was paid for only seven block hours. On September 10, 2013, her duty day was 2 hours and 32 minutes, but she was paid for only 1 hour and 5 minutes. Sitavich received junior man pay once. For the week of April 8-14, 2013, Sitavich was paid an effective rate of $20.45 per hour based on her duty time, not including any work performed outside of her duty days. Sitavich regularly worked hours that were not part of her duty day preparing irregular operations reports, reading training materials, and arriving early at the airport due to the unpredictability of security at O'Hare.

### 6. Sarah Hudson

Sarah Hudson worked as an FA for SkyWest for just under two years, based at Fresno Yosemite International Airport. On October 4, 2013, Hudson received only two hours of block pay for a duty day of 4 hours and 37 minutes. On October 5, 2013, she was paid for 3 hours and 34 minutes of block time for a duty day of 8 hours and 31 minutes. During the 15 day period between January 31 and February 15, 2014, Hudson was paid $514.89 for a total of 65.73 duty hours, averaging to $7.83 per hour, not accounting for work outside of her duty days.

### 7. Brandon Colson

Brandon Colson worked as an FA for SkyWest for two years, exclusively based at Phoenix Sky Harbor International Airport. Flights in and out of Phoenix were regularly delayed due to high temperatures. One flight Colson was working was diverted to Tucson, where the plane pulled up to a jet bridge and the main cabin door was opened, ending Colson's "block time." Colson was nonetheless required to continue working, addressing passenger needs for two

hours until they were able to resume their flight. Colson received junior man pay during only once. Every week or every other week, Colson had to spend time outside of his duty day preparing irregular operations reports, and he regularly had to work for more than fifteen minutes after the main cabin door opened on the final flight of a day.

### 8. Brüno Lozano

Brüno Lozano worked as a SkyWest FA for over two years, during which he was based in Los Angeles, San Francisco, and Seattle. Lozano never received time-and-a-half pay. Lozano worked extremely long duty days, and worked additional hours outside of his duty days.

### C. Procedural History

The *Hirst* suit (plaintiffs Hirst, Stover, and Sze) was filed in March 2015, while the *Tapp* suit (plaintiffs Tapp, Sitavich, Hudson, Colson, and Lozano) was filed in November 2015. The first amended complaint in *Hirst* alleged that SkyWest violated the Fair Labor Standards Act and the Illinois Minimum Wage Law ("IMWL") by failing to pay the plaintiffs the minimum wage for their compensable hours. The complaint indicated that the suit was brought as a collective action under the FLSA, 29 U.S.C. § 216(b),[5] and the plaintiffs also sought to represent a class of Illinois-based FAs under Federal Rule of Civil Procedure 23 as to the IMWL claim. On SkyWest's motion, the court initially dismissed the *Hirst* plaintiffs' FLSA claims without prejudice and dismissed their IMWL claims with prejudice. On the plaintiffs' motion to reconsider, the court converted its dismissal with prejudice of the plaintiffs' IMWA claims to a dismissal without prejudice.

---

[5] The viability of FLSA claims asserted on behalf of other SkyWest FA's appears questionable at this juncture, in light of the fact that "the claims of potential members of an FLSA collective action are not tolled until they file opt-in notices." *Hollins v. Regency Corp.*, 867 F.3d 830, 834 (7th Cir. 2017). *See also Genesis Healthcare Corp. v. Symczyk*, 569 U.S. 66, 75 (2013) (other similarly situated employees "become parties to a collective action only by filing written consent with the court"). No opt-in notices have been filed in either case.

The *Hirst* plaintiffs subsequently filed a second amended complaint and the *Tapp* plaintiffs filed a first amended complaint; those complaints are the subject of the instant motions to dismiss. The *Hirst* second amended complaint again alleges, based on the foregoing facts, that SkyWest violated the Fair Labor Standards Act and the Illinois Minimum Wage Law. The Tapp amended complaint alleges violations of FLSA, California Wage Order 9-2001, California Labor Code Sections 201, 202, 203, 204, 226, 1182.12, 1194, and 1194.2, California Business and Professional Code Section 17200, San Francisco Administrative Code Section 12R, the Los Angeles Living Wage Ordinance, the Arizona Wage Act, the Arizona Minimum Wage Act, and the Washington Minimum Wage Act.

## II. DISCUSSION

The motion to dismiss presents two principal issues: Have the plaintiffs plausibly alleged that they were ever paid less than the federal minimum wage? And is SkyWest required to comply with state and local wage laws concerning the compensation paid to its FAs?

### A.    FLSA Claims

The FLSA requires that "[e]very employer shall pay to each of his employees who in any workweek is engaged in commerce...not less than—$7.25 an hour." 29 U.S.C. § 206(a)(1)(C).[6] In its previous opinion, the court grappled with the appropriate way to determine whether an employer met this obligation. Over what period of time must an employee's wages be measured under the FLSA? Must an employee's rate of pay equal or exceed the minimum wage over the course of each hour the employee works? Or can an employee's hourly rate dip below the

---

[6] The federal minimum wage of $7.25 per hour went into effect on July 24, 2009 and has not been increased since. Accordingly, it was the relevant wage rate for the entire period of the plaintiffs' claims, which extend back three years at most from the filing of the complaints in 2015.

minimum wage for some limited periods so long as the employee's wage exceeds $7.25 per hour over the course of a day, or a week, or a month?

The court determined that "courts uniformly calculate the hourly wage over the course of a workweek—*i.e.*, dividing the total compensation an employee received in a workweek by the compensable hours worked." *Hirst v. SkyWest, Inc.*, No. 15 C 02036, 2016 WL 2986978, at *5 (N.D. Ill. May 24, 2016) ("*Hirst I*").[7] Consistent with this requirement, numerous courts have held that under the workweek averaging standard, "the plaintiffs must plausibly allege at least one workweek for which the compensation they received, divided by their total compensable time, failed to meet the FLSA minimum wage of $7.25 per hour." *Hirst I*, 2016 WL 2986978, at *6. *See, e.g., Hughes v. Scarlett's G.P., Inc.*, 2016 WL 4179153, *2 (N.D. Ill. Aug. 8, 2016) (following *Hirst I*); *Pruell v. Caritas Christi*, 678 F.3d 10, 13-15 (1st Cir. 2012); *Lundy v. Catholic Health Sys. of Long Island Inc.*, 711 F.3d 106, 114 (2d Cir. 2013) ("we find no

---

[7] As noted, although the Seventh Circuit has never addressed this question, every Circuit Court of Appeals that has done so has concluded that the workweek is the appropriate unit of measure to apply to FLSA minimum wage claims. *See Douglas v. Xerox Business Services, LLC,* --- F.3d ---, 2017 WL 5474213, *5 (9th Cir. Nov. 15, 2017) (affirming dismissal of claims where plaintiffs could not establish that non-compensated time reduced their effective wage rate below the federal minimum over the course of any workweek); *U.S. Dep't of Labor v. Cole Enterprises, Inc.*, 62 F.3d 775, 780 (6th Cir. 1995) ("[A]n employer meets the minimum wage requirements if the total weekly wage paid is equal to or greater than the number of hours worked in the week multiplied by the statutory minimum hourly rate."); *Hensley v. MacMillan Bloedel Containers, Inc.,* 786 F.2d 353, 357 (8th Cir. 1986) ("no [FLSA] violation occurs 'so long as the total weekly wage paid by an employer meets the minimum weekly requirements of the statute, such minimum weekly requirement being equal to the number of hours actually worked that week multiplied by the minimum hourly statutory requirement.'" (quoting *United States v. Klinghoffer Bros. Realty Corp.,* 285 F.2d 487, 490 (2d Cir. 1960)); *Dove v. Coupe,* 759 F.2d 167, 171-72 (D.C. Cir. 1985) ("While the minimum wage laws logically could be construed as requiring hour-by-hour compliance, [ ] both administrative and judicial decisions established the workweek as the measuring rod for compliance...."); *Olson v. Superior Pontiac-GMC, Inc.*, 765 F.2d 1570, 1576-77 (11th Cir.), *modified on other grounds*, 776 F.2d 265 (11th Cir. 1985) (applying weekly averaging approach to example compensation scheme); *Blankenship v. Thurston Motor Lines,* 415 F.2d 1193, 1197-98 (4th Cir. 1969) (applying the weekly averaging approach).

plausible claim that FLSA was violated, because Plaintiffs have not alleged a single workweek in which they worked at least 40 hours and also worked uncompensated time in excess of 40 hours); *Davis v. Abington Mem. Hosp.*, 765 F.3d 236, 241-42 (3d Cir. 2014) (agreeing with Second Circuit's analysis in *Lundy*); *Landers v. Quality Communications, Inc.*, 771 F.3d 638, 644-45 (9th Cir. 2014) (expressly adopting rationale of *Pruell*, *Lundy*, and *Davis*); *Hall v. DirectTV LLC*, 846 F.3d 757 (4th Cir. 2017) (following *Lundy*, *Davis*, and *Landers*). Because the plaintiffs failed to allege facts that would satisfy this pleading standard by plausibly suggesting that their compensation dipped below the federal minimum wage even once over the course of a workweek, the court dismissed the prior iteration of the plaintiffs' FLSA claim. *Hirst I*, 2016 WL 2986978 at *7. The prior complaint failed to allege the plaintiffs' hourly wages, the total compensation they received for any workweek, and for two of the three plaintiffs, the total number of hours worked in any given week. Although the complaint contained some pairing information for plaintiff Hirst, a calculation based on that information revealed that Hirst was paid well over minimum wage over the course of the example pairings. *Id.*

Notwithstanding this precedent and the court's dismissal of the prior complaint, the plaintiffs' current complaints have not remedied the fatal defect: they still fail to allege that there was even one workweek in which any of the plaintiffs did not receive at least the federal minimum wage for compensable work performed over the course of a workweek. To be sure, this time around the plaintiffs provide more detail, but the deficiency remains. For virtually all of the plaintiffs, the complaints contain the total number of "duty" hours the plaintiff worked during certain specific flight pairings. And some plaintiffs have pled their rate of pay at certain points in time. But no plaintiff has pled information sufficient to infer that they were paid below $7.25 per hour over the course of a given work week. Simple arithmetic tells us that an FA's average

12

hourly wage over the course of a workweek may be ascertained by dividing the total amount the FA was paid that week by the number of compensable hours the FA worked over the same period. Not one plaintiff, however, has provided that information for even a single workweek. Nor has any plaintiff alleged even in more general terms that she or he was paid less than $7.25 per hour over the course of any workweek.

And indeed, *the plaintiffs concede that they cannot do so*. In their complaints, they acknowledge that "flight attendants cannot reasonably calculate their actual hourly rate of pay for any given workweek." *Hirst* Compl. ¶ 73; *Tapp* Compl. ¶¶ 77; *see also, e.g.*, *Tapp* Compl. ¶ 98 ("Ms. Hudson's hourly rate of pay for a given workweek cannot be accurately determined, nor are the records necessary to determine this information accessible from any source."). A plaintiff's concession that she cannot determine her hourly wage over the course of any workweek is a concession that she cannot state a FLSA minimum wage claim. "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007); quotation marks and citation omitted). Failing to allege facts that plausibly support an inference that the average weekly wage paid by SkyWest to the plaintiffs fell below the federal minimum wage, the amended complaints do not sufficiently allege a FLSA violation.[8]

---

[8] Although the complaints make sparse references to SkyWest's alleged violations of an FLSA record-keeping provision, 29 U.S.C. § 211(c), plaintiffs do not appear to pursue independent claims based on those alleged violations, and do not mention § 211(c) in their briefs. Rather, plaintiffs attempt to use SkyWest's purported record-keeping violations to bolster their claim that SkyWest paid them below the federal minimum wage.

Given the plaintiffs' conceded inability to determine their hourly wages, it is no surprise to see that the amended complaints do not actually plead that any of the plaintiffs were not paid the minimum wage over the course of even one week. Despite the plaintiffs' seeming acknowledgment that the workweek standard is the appropriate unit of measure for a FLSA claim—see *Hirst* Compl. ¶ 121—what the amended complaints continue to allege, instead, is that "on certain workdays," *Hirst* Compl. ¶ 125, the "block time" wages they received did not meet the minimum wage over the course of that day. But that, again, is the wrong measure. *Hirst I*, 2016 WL 2986978, at *5. By clinging to that erroneous workday standard the plaintiffs only further confirm that they don't have the goods to allege plausible FLSA violations based on the appropriate standard, namely the workweek.[9]

Far from increasing the plausibility of the plaintiffs' claims, the new data set forth in the amended complaints confirm what the plaintiffs' have now expressly acknowledged. Where the plaintiffs *have* pled both their total pay (or information sufficient to establish their total pay) and their total number of duty hours over a given multi-day period (other than a workweek, which, again, no one has pled), the data reveal that the plaintiffs were paid in excess of the federal minimum wage. Plaintiff Hirst again uses her December 21-24, 2014 pairing as an example, but, as the court previously concluded, her average hourly pay during that pairing was $14.82, more than double the $7.25 minimum wage. *Hirst I*, 2016 WL 2986978, at *6. Plaintiffs Stover and

---

[9] The plaintiffs do allege that during particular weeks they worked in excess of 40 hours without receiving time-and-a-half compensation, but that fact has no relevance in the context of a FLSA claim because the FLSA exempts airlines from paying overtime wages. *See* 29 U.S.C. 213(b)(3). The plaintiffs, acknowledging this, do not assert a claim based on non-payment of overtime compensation. And to the extent that the complaints acknowledge that notwithstanding this overtime exemption, SkyWest paid time-and-a-half in certain circumstances, it further undermines the minimum wage claim because in paying-time-and-a-half, the company increased, rather than decreased, the effective wage rate, making it less plausible, not more, that the FAs received less than the minimum wage over the course of a workweek.

Hudson allege that there were single bi-monthly periods—periods of slightly over two weeks—where their total wages divided by their number of duty hours were $7.62 and $7.83, respectively. These totals, of course, exceed the federal minimum wage. None of the pairing data provided in the amended complaints shows any multi-day period, much less a week, during which a plaintiff received less than minimum wage.

The plaintiffs attempt to make up the deficit of uncompensated duty day hours by pointing to "off-the-clock" work they performed before reporting in for their duty day and after their release. This "preliminary and postliminary" uncompensated work, they allege, includes time spent at the airport clearing security, reading communications from SkyWest ("Know Before You Go" emails), debarking passengers for more than 15 minutes after the last flight of a pairing, writing "irregular operations reports" as needed, and complying with mandatory drug screening before or after flights. See *Hirst* Compl. ¶ 61. Even assuming that these activities are compensable,[10] the allegations offered fall short of plausibly establishing that the performance of these duties has ever caused any of the plaintiffs to work so many hours that their average hourly rate for the week dipped below the federal minimum wage. They allege only that the amount of time spent on such tasks "ranges from minutes per working day up to several hours per working day," *Hirst* Compl. ¶ 62, and that uncompensated time not included in the duty day "often include[s] several hours of unpaid time per workweek." *Hirst* Compl. ¶ 122. Apart from the fact that the plaintiff's candid assessment of the time required by these tasks is relatively modest,[11]

---

[10] The defendants do not argue that these tasks should not be treated as compensable work, so for purposes of this motion the court assumes, without deciding, that they are.

[11] The amended complaints provide little basis to infer that these extra-duty hour tasks required a great deal of time. The complaints make much ado, for example, about "irregular operations reports," but according to Plaintiff Colson, such reports were needed only once every 1-2 weeks (Tapp ¶ 108) and the complaints provide no estimate of how long it typically takes to prepare such report. So too with "Know Before You Go" communications. And over the course

the plaintiffs do not identify any particular week or weeks when such tasks, added to their duty day hours, reduced their effective wage rate to below $7.25 per hour. As noted above, the complaints stop short of alleging that there was ever an occasion when such tasks combined with duty hours to drive their wage rates below minimum wage.

The sheer possibility that FAs worked a few minutes, or even several hours, of "off-the-clock" work that were not counted as part of their duty days is insufficient to give rise to a plausible claim for relief. Adding "several" hours (we'll assume that means about three hours, as common parlance would suggest) of weekly non-compensated off-the-clock time, as alleged by the complaints, to Hirst's December 21-24, 2014 pairing, for example, would reduce her effective rate of pay over that period from $13.12 to $12.27, still far above the minimum wage rate; over the course of that pairing, Hirst would have had to work some *35* additional noncompensated hours beyond her duty hours to drive her wage rate below minimum wage—that is, five hours a day. Nothing in the complaints suggests that pre- and post-duty hour work required anywhere near that amount of time. Plainly, these facts do nothing to make Hirst's claim more plausible.[12]

Let's consider, though, the claims of plaintiffs Stover and Hudson. As noted above, the amended complaints include data for each of these plaintiffs; calculating their average wage rate over a 15-day period based on their duty hours shows that their wage rates for those periods were

of a multi-day pairing, even an FA based at O'Hare might only have to clear security at O'Hare once, so there seems little reason to infer that the need to arrive early at O'Hare would requires significant off-the-clock time. Nor do the complaints include any allegations about how often it took more than 15 minutes to debark passengers or by how much that benchmark was typically exceeded.

[12] Based on the data set forth in the amended complaints, effective wage rates for Tapp and Sitavich may also be calculated, and those rates (for Tapp, $15.47 and $13.49 for two different pairings, and for Sitavich $20.45) are even higher than Hirst's. No data sufficient to make an effective wage calculation for plaintiffs Sze, Colson, or Luzano is provided. The calculations as to plaintiffs Stover and Hudson are discussed below.

$7.62 and $7.83, respectively—above the minimum wage, but not by a lot. Even so, for those rates to be reduced to $7.25 per hour, Stover and Hudson would have to have worked an additional 4.48 and 5.29 hours of "off-the-clock" time, respectively, over that 15-day period, an amount of time that is consistent with the allegation that FAs often preformed several hours of uncompensated time beyond their duty hours over the course of a workweek. The problem for these plaintiffs, though, is that even if it is plausible to infer that, in some weeks, Stover and Hudson worked this much off-the-clock time, whether they worked that many uncompensated hours during these particular periods is anybody's guess; the complaint contains no allegations whatsoever about the number of off-duty hours plaintiffs Stover and Hudson worked during the identified 15-day periods. Instead, they posit that it is possible that they did so. And so it is, but as *Twombly* and *Iqbal* make plain, federal pleading requires the assertion of facts sufficient to distinguish the plausible from the merely possible. "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 557; quotation marks and citations omitted). *See also, e.g., Camasta v. Jos. A. Bank Clothiers, Inc.*, 761 F.3d 732, 736 (7th Cir. 2014) ("To survive a motion to dismiss under Rule 12(b)(6), the complaint must provide enough factual information to . . . raise a right to relief above the speculative level." (internal quotation marks omitted).

In lieu of affirmative allegations that their hourly rates ever dipped below the federal minimum wage, the plaintiffs essentially contend that, given the variability of off-the-clock hours work and uncompensated duty hours work, there must have been some coincidental occasions when the number of those hours combined to reduce their average hourly rate over that week below the minimum wage. But that is utter speculation, not plausible allegation, and the

17

former does not suffice to state a claim. That is why courts of appeal that have addressed the pleading requirements for FLSA claims have consistently held that allegations to the effect that employees frequently or typically performed uncompensated work do not suffice to allege a plausible FLSA claim. *See, e.g., Lundy*, 711 F.3d at 114-15 (rejecting allegations that plaintiffs "occasionally," or "typically," or "often" worked additional or longer shifts or performed other uncompensated work as insufficient to plausibly allege that there was ever a week in which plaintiffs worked uncompensated overtime hours); *Nakahata v. New York-Presbyterian Healthcare Sys., Inc.*, 723 F.3d 192, 201 (2d Cir. 2013) ("allegations . . . that Plaintiffs were not compensated for work performed during meal breaks, before and after shifts, or during required trainings—raise the possibility that Plaintiffs were undercompensated in violation of the FLSA [but] . . . do not state a plausible claim for such relief. To plead a plausible FLSA overtime claim, Plaintiffs must provide sufficient detail about the length and frequency of their unpaid work to support a reasonable inference that they worked more than forty hours in a given week."); *Davis*, 765 F.3d at 242 (rejecting as implausible allegations that plaintiffs "typically worked full time, or very close to it" and "also worked several hours of unpaid work each week" because the combination of those allegations fell short of alleging that any of the four plaintiffs had ever actually performed more than forty hours of compensable work in a week).

As these cases illustrate, it is one thing to allege affirmatively that plaintiffs regularly worked *X* number of hours a week and received less than $7.25*X* in compensation during one or more of those weeks; it is another thing to allege, as the plaintiffs do here, that they sometimes worked "several" uncompensated off-the-clock hours in a week and that they may have done so in a week in which they worked so many uncompensated duty hours that they averaged less than $7.25 for the week. *Twombly* and *Iqbal* do not require mathematical precision,

but they do require courts to distinguish between allegations that a defendant *might* be liable and allegations that support a reasonable inference that a defendant *is* liable. *Iqbal,* 556 U.S. at 678. None of this is to say that it is not possible that one or more of the plaintiffs ever worked for less than minimum wage over the course of a week. But here the facts do not permit a plausible inference, as distinguished from a guess, that any of these plaintiffs ever did so. At best, the plaintiffs allege nothing more than the possibility that, during some unknown week or weeks, they worked enough off-duty hours to drive their effective wages below $7.25 hour. Where the plaintiffs themselves acknowledge that they cannot identify even a single instance when this occurred, however, there simply is not an adequate basis to infer that the "possible" ever actually occurred. "Where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'shown'—'that the pleader is entitled to relief.'" *Iqbal,* 556 U.S. at 679 (quoting Fed. R. Civ. P. 8(a)(2)).

In their response brief, the plaintiffs devote only two pages to defending the sufficiency of their pleadings with respect to their FLSA claims, making two arguments. First, they argue that it is impossible for them to allege that their average wages over the course of a workweek were below minimum wage because SkyWest controls—and will not provide to them—the documents necessary to conduct a weekly calculation. This argument is unavailing for several reasons. First, as a general matter, a plausible claim must precede, not follow, discovery. A plaintiff "armed with nothing more than conclusions" does not "unlock the doors of discovery." *Iqbal*, 556 U.S. at 678-79. It is no answer to say that discovery *might* provide factual support for conclusory allegations that the plaintiffs were paid under minimum wage over the course a workweek; the factual allegations must be sufficient "to raise a reasonable expectation that discovery **will** reveal evidence" of the claimed misconduct. *Twombly,* 550 U.S. at 556 (emphasis

added). Second, although "plaintiffs' pleading burden should be commensurate with the amount of information available to them," *Olson v. Champaign County, Ill.*, 784 F.3d 1093, 1100 (7th Cir. 2015), it bears noting here that SkyWest produced some, if not all, of their Sked+ and payroll records to the plaintiffs and that these records were available to the plaintiffs in drafting their amended complaints. SkyWest *Hirst* Br. at 6 n.4, ECF No. 95. Third, the court **granted** the plaintiffs limited pretrial discovery, *see Hirst* ECF Nos. 96 and 101; that followed filing of the amended complaints and briefs on the motion to dismiss, but the plaintiffs have not sought further leave to amend their briefs or to supplement their pleadings based on any new information they obtained from SkyWest.

And finally on this point, the plaintiff's premise that they cannot calculate their average hourly rate over the course of a workweek because "all" of the necessary records "are in the possession and control of SkyWest" is simply not accurate. For starters, some of the information about "off-the-clock" work that the plaintiffs say should be included in the calculation would seemingly be within the possession of the plaintiffs, not SkyWest. A number of the plaintiffs allege, for example, that they regularly arrived early at O'Hare to avoid the unpredictability of security lines, but the plaintiffs do not explain why SkyWest would have records reflecting how early individual FAs opted to show up at the airport. Similarly, it is not at all clear how SkyWest, rather than the FAs, would have information about how much time, if any, they spent reviewing "Know Before You Go" information each day before reporting for duty or preparing "irregular operations" reports after duty.

Moreover, much of the information plaintiffs claim they do not have could easily have been ascertained with due diligence. The plaintiffs could have kept track of the amount of time, or consulted records that would have provided more data on which to base their allegations. The

amount that the plaintiffs were paid in each period, for example, should be readily available to them via their wage statements and bank account records. Records of contemporaneous communications, both as to their substance and as evidence of when the plaintiffs were working and when they were not, could have been consulted. So too things like calendars, credit card receipts, cell phone bills, and tax records. Doubtless some records within the plaintiffs' control disappeared over the years, but the poverty of information these plaintiffs claim is nearly absolute. Hirst, for example, claims not even to know when she moved from Minneapolis-St. Paul to Chicago, a fact that surely could be reconstructed from information in her possession. The claim that not one of these plaintiffs could access enough information to come up with a reasonable estimate of their hourly rates were for even a single workweek is not at all persuasive and is indicative of either a lack of diligence or a lack of helpful data.

It bears noting as well that although FLSA plaintiffs are not required to establish their wage rates with mathematical precision, courts "have recognized that it is employees' memory and experience that lead them to claim in federal court that they have been [compensated] in violation of the FLSA in the first place," and they must "draw on those resources in providing complaints with sufficiently developed factual allegations." *Dejesus v. HF Management Services, LLC*, 726 F.3d 85, 90 (2d Cir. 2013); *Hughes v. Scarlett's G.P., Inc.*, No. 15-cv-5546, 2016 WL 4179153, at *4 (N.D. Ill. Aug. 8, 2016) ("[T]he law requires FLSA plaintiffs to draw upon memory and experience in providing complaints with sufficiently developed factual allegations." (alteration omitted)). Nevertheless, none of the plaintiffs has been willing to make even an *estimate* about the average amount of off-the-clock time they spent during any particular week. Rather, they have only been willing to plead that in some weeks, the aggregate off-the-clock time totaled "several hours." That allegation, even accepting it as true for purposes of this

21

motion, does nothing to allege the effect of those hours on the average hourly wage over the course of any given workweek. The plaintiffs still fail to plead a single week, or even a single pay period, in which they were paid below $7.25 per hour.

The plaintiffs' second argument to excuse their pleading deficiency confuses evidentiary burdens and pleading burdens. Citing *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1047 (2016), the plaintiffs argue that they have no burden to plead that their workweek wages were below $7.25 as long as they plead that they performed some uncompensated work. In *Tyson Foods*, the Supreme Court established a burden shifting framework in FLSA cases, noting that an employee carries his initial evidentiary burden "if he proves that he has in fact performed work for which he was improperly compensated and if he produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference." 136 S. Ct. at 1047. "The burden then shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to negate the reasonableness of the inference to be drawn from the employee's evidence." *Id*. According to the plaintiffs, *Tyson Foods* permits them to survive a motion to dismiss by pleading that that they engaged in uncompensated work. But the *Tyson Foods* framework is an evidentiary standard, and "does not address pleading standards." *Hughes*, 2016 WL 4179153, at *4. "[I]ts language regarding 'evidentiary gaps' and 'burden-shifting' does not apply to the present motions." *Id*. Moreover, even if the *Tyson Foods* framework were applicable at the pleadings stage, it requires plaintiffs to "show the amount and extent" of their uncompensated work—which, as the court previously noted, plaintiffs have failed to do.

The bottom line with respect to the plaintiffs' FLSA claims is this: in these complaints, we encounter eight plaintiffs who, at the time the amended complaints were filed, had worked an

aggregate of some 1500 weeks (more than 28 years) for SkyWest,[13] yet could not allege that in even one of those weeks one of them had not been paid at least the federal minimum wage. Failing to clear that very low bar, the FLSA claims they assert fail and, because the plaintiffs have had the opportunity to replead in an effort to cure this deficiency, the FLSA claims are dismissed with prejudice.

## II.    State Law Claims

In its previous opinion, the court dismissed the *Hirst* plaintiffs' Illinois Minimum Wage Law claims with prejudice, concluding that the IMWL was preempted by the Dormant Commerce Clause. On the plaintiffs' motion for reconsideration, the court converted the dismissal to be without prejudice, giving the plaintiffs an opportunity to plead facts indicating that SkyWest's burden of compliance with state and local wage laws would be insubstantial. Under the Dormant Commerce Clause, a regulation that is neutral on its face or only has indirect effects on interstate commerce "will be upheld 'unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits.'" *Nat'l Solid Wastes Mgmt. Ass'n v. Meyer*, 63 F.3d 652, 657 (7th Cir. 1995) (quoting *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970)). Previously, the court explained:

> [T]he IMWL provisions would only apply to FAs based in Illinois and only to the hours they worked in Illinois. To calculate the time plaintiffs worked to which the IMWL would apply, SkyWest would have to track each minute pre- or post-flight in Illinois and the amount of turn time between flights that FAs spent in Illinois. Moreover, if the IMWL were applicable to SkyWest FAs, then every state's comparable laws would also apply, subjecting SkyWest to 50 or more regulations depending on where each FA was physically located at a particular moment in time. Requiring compliance with the IMWL would not be a simple matter of

---

[13] Hirst (>260 weeks) + Stover (>104 weeks) + Sze (>104 weeks) + Tapp (>260 weeks) + Sitavich (>416 weeks) + Hudson (<104 weeks) + Colson (104 weeks) + Luzano (>104 weeks) $\cong$ 1500 weeks.

> setting an FA's minimum wage at the statutory amount in the state in which she is based; it would impose a labyrinth of potentially conflicting wage laws upon FAs based out of different states and cities, working on the same flights, literally moving through interstate commerce on a daily basis. This is precisely the type of burden on interstate commerce that the Commerce Clause prohibits.

*Hirst I*, 2016 WL 2986978, at *10 (citations and footnotes omitted).

In their amended complaints and their briefs, the plaintiffs say little about the burdens SkyWest would face if forced to comply with each state and local wage law. Instead, the plaintiffs argue that compliance would not be cumbersome because only the wage laws of the state and locality where an FA is based would apply to her. Would that it were so simple. Neither the plaintiffs nor SkyWest can determine by fiat when and where state laws apply. Some wage ordinances, for example, may apply to all hours worked by an employee who is employed within a state, even if some hours are worked out of state; others apply only to employees who work predominantly in one state for hours they work in that state, while still others apply to all hours worked by an employee in a state, even if the employee predominantly works or is employed elsewhere. *Compare Miller v. Farmer Bros. Co.*, 150 P.3d 598, 606 (Wash. Ct. App. 2007) (noting that Washington's overtime law "does not make any exception for overtime hours worked outside Washington State" if the employee engaged in "employment within the state of Washington"), *with Wooley v. Bridgeview Bank Mortgage Co., LLC*, No. 14 C 5757, 2015 WL 327357, at *2-3 (N.D. Ill. Jan 23, 2015) (holding that the Illinois Minimum Wage Law applies only to Illinois employees for conduct occurring in Illinois), *and Sullivan v. Oracle Corp.*, 254 P.3d 237, 242-44 (Cal. 2011) (holding that California's overtime laws apply to certain work performed in California by out of state employees). Further complicating matters is the fact that different states use different measures for calculating minimum wage; while some, like Illinois,

follow the federal model of averaging hourly rates over a workweek, others, like California, require that at least minimum wage be paid for every hour work, even if some hours are compensated at a rate higher than minimum wage.

The burdens that would be imposed on airlines were they required to comply with state and local wage laws concerning flight attendants,[14] then, is more substantial than merely complying with the wage laws of the state where each FA is *based*.[15] Instead, SkyWest would be forced to contend with the wage laws of each state in which an FA *works*. And because FAs routinely work in multiple states (and cities) on any given day, and in different combinations of states and cities for any given route assignment, the compliance burdens that would be imposed on SkyWest to pay its FAs in accordance with the applicable laws of all of the states and cities in which they performed work would be monumental. In order to do so, SkyWest would have to (1) measure each increment that each FA spends on the ground in each of the 43 states in which it operates, (2) determine the precise extent to which each wage law in the states and localities in which it operates applies and/or applies extraterritorially, and then (3) ensure compliance with a different set of wage laws and ordinances for each FA based on the amount of time they spent in

---

[14] This opinion is based on facts alleged with respect to flight attendants only; no suggestion that the Dormant Commerce Clause exempts other airline employees from state and local wage regulation is intended.

[15] Even that burden could be substantial. As SkyWest notes, bases change frequently. Further, as the plethora of statutes on which plaintiffs rely for their non-FLSA claims confirm, it will often be the case that more than one jurisdiction can lay claim to being the location where an FA is "based." The California "based" plaintiffs, for example (plaintiffs Tapp, Sitavich, and Lozano), assert claims based not only on California law, but also on ordinances enacted by Los Angeles and San Francisco. And although the plaintiffs do not invoke it because it was enacted after the period of their claims, the City of Chicago, where plaintiffs Hirst, Stover, and Sze were "based," has also adopted its own minimum wage law. As of November 15, 2017, some 39 cities and counties have adopted their own minimum wage laws; SkyWest flies to many of them. *See* Inventory of Local Minimum Wage Ordinances (Cities and Counties), U.C. Berkeley Center for Labor Research and Education, available at http://laborcenter.berkeley.edu/minimum-wage-living-wage-resources/inventory-of-us-city-and-county-minimum-wage-ordinances/ (last visited Nov. 29, 2017).

each state and locality. Because an FA's pairings often shift from week to week, and involve multiple jurisdictions each day, SkyWest would have to comply with a different patchwork of wage laws for the same employee virtually every day. And even if it could do so, SkyWest would still be forced to contend with the result of applying this patchwork of local wage and hour laws—namely, that FAs doing precisely the same work, on the same routes, would be subject to different wage requirements based on where they were domiciled, or based, or worked the most. As the court noted in its earlier opinion, this is precisely the kind of onerous burden on interstate commerce that the Commerce Clause prohibits, even in the face of weighty state interests in protecting workers and providing a living wage. *See Bibb v. Navajo Freight Lines, Inc.*, 359 U.S. 520, 527 (1959) (stressing "the need for national uniformity in the regulations for interstate travel").

Although the plaintiffs principally engage with Dormant Commerce Clause theories not at issue here,[16] they rely heavily on *Bernstein v. Virgin America, Inc.*, 227 F. Supp. 3d 1049 (N.D. Cal. 2017) in which a district court rejected an airline's Dormant Commerce Clause challenge to California wage laws. In *Bernstein*, the court first determined that California uses a multi-factor test to determine when its wage laws apply to work conducted elsewhere, considering the employee's residency, where the employee received her pay, the employee's principal job situs, the employer's residency, and the extent to which the employee worked outside the state. *Id*. at 1060. Based on this premise, the court ruled that because both the airline and the plaintiff employees had deep ties to California, California's labor laws would apply to the plaintiffs wherever they might work, inside the state or outside. The court rejected the

---

[16] For example, plaintiffs extensively discuss a Dormant Commerce theory concerning the extraterritorial effect of state statutes, as opposed to the operative issue here, which is the Dormant Commerce clause's prohibition on statutes that excessively burden interstate commerce.

airline's premise that if it was forced to comply with California labor law, "it [would] necessarily have to comply with other states' wage and hour laws, too. *Id*. at 1065. The court reasoned that in the absence of evidence that other states had equally deep ties to the airline and its flight attendants, there was no basis to conclude that other states would require the airline to abide by their wage and hour laws. *Id*. at 1066. And because only California law would apply, in the *Bernstein* court's view, there was only a minimal administrative burden on the defendant, who only had to comply with California law.

Respectfully, this court does not find *Bernstein*'s analysis persuasive and the case is distinguishable in any event. The problem with *Bernstein* is that the court assumed that only California law would apply to flight attendants who are based in California, when in reality, each state and locality defines the parameters of its own wage laws. That California asserts, for whatever reason, that its labor law applies to an FA does not, of course, preclude another state from similarly claiming that its labor laws apply to that FA. Nor does it explain why any state would not, at a minimum, take the position that its labor laws apply to its residents performing work within its borders. SkyWest cannot assume that the wage laws of 42 other states do not apply merely because it complies with the laws of the state in which its FAs are based. For example, as the *Bernstein* court acknowledges with no sense of irony, "'California applies its Labor Code equally to work performed in California, whether that work is performed by California residents or by out-of-state residents.'" *Id*. at 1067 (quoting *Sullivan v. Oracle Corp.*, 662 F.3d 1265, 1271 (9th Cir. 2007)). So do many other states. Why, then, if FAs are subject to state and local wage and hour laws, is it unreasonable to posit that those states and cities, too, would seek to enforce their laws on California-based FAs working within their borders? It isn't. Indeed, it can be assumed that if California, or any other state, were permitted to enforce its labor

laws against interstate airlines, every other state would also be permitted to enforce their labor laws to the extent applicable. *See Legato Vapors, LLC v. Cook*, 847 F.3d 825, 834 (7th Cir. 2017) (holding that "the threat of inconsistent regulation, not inconsistent regulation in fact, is enough" to implicate the Dormant Commerce Clause). In assuming that only California law would apply to the plaintiffs, then, the *Bernstein* court substantially underestimated the extent of the administrative burden it imposed on the defendant in requiring it to comply with state and local wage laws.

*Bernstein* is in any event distinguishable; there Virgin Atlantic was based in California, formulated its wage policies in California, operated primarily in California, and the employees at issue were all California residents. *Bernstein*, 227 F. Supp. 3d at 1066. Here, SkyWest is not based in any of plaintiff's states and plaintiffs' premise is not that the law of any one of their states applies to all of them. *Bernstein*'s understanding that only California law would apply to the FAs in question is decidedly ***not*** the premise of the plaintiffs here. Rather, the plaintiffs assert that multiple state (and local) laws apply to FAs, depending solely on where they are based. But if *Bernstein* stands for anything, it is that application of state wage law may turn on more than the single factor of where someone is based. *Bernstein* really proves SkyWest's point: many states (or plaintiffs seeking the benefit of a state's wage laws) may take very aggressive positions about application of their laws to FAs who live, or are based, or work temporarily within, their borders, creating a massive compliance burden. Indeed, if state and local wage laws could apply to SkyWest FAs, SkyWest would be forced to determine which state and local wage laws apply based on the precise amount of time each FA spends in each locale, and then comply with a different set of wage laws on a weekly, daily, or even hourly basis. This isn't a logistical conundrum; it's a logistical nightmare.

In short, the plaintiffs have done nothing to persuade the court to change its earlier ruling with regard to the Dormant Commerce Clause. Application of state wage and wage statement laws to SkyWest's FAs would impose a substantial burden on SkyWest that the Commerce Clause does not abide. *See, e.g., Ward v. United Airlines, Inc.*, No. C 15-02309, 2016 WL 3906077, at *5 (N.D. Cal. July 19, 2016) (holding that the local benefits of California's wage statement laws were "outweighed and even undermined by the burden that would result from application of [the law] and comparable laws in other states to this class of pilots");[17] *Fitz-Gerald v. Skywest Airlines, Inc.*, No. 01129514, 2005 WL 3118764, at *1-2 (Cal. Sup. Ct. Oct. 13, 2005), *aff'd*, 65 Cal. Rptr. 3d 913 (Ct. App. 2007). The court therefore dismisses plaintiffs' state law claims with prejudice.[18]

---

[17] The *Bernstein* court criticized *Ward*'s conclusions with regard to the Dormant Commerce Clause as "entirely dependent on its erroneous conclusion that California law only applies to individuals who work principally or exclusively in California." *Bernstein*, 227 F. Supp. 3d at 1066. In the *Bernstein* court's view, airlines would not have to "monitor the pilot's precise hours spent working in each state and determine which state's laws applied" because "principal job situs is *not* dispositive of whether California law applies to the Plaintiffs." But this criticism is again based on the faulty assumption that California law is the *only* applicable law. Moreover, *Bernstein*'s assertion that airlines would not have to keep track of the times a pilot or flight attendant worked in each state is questionable given that it cites job situs as a factor—albeit non-dispositive—in determining whether California law applies. *See id*. at 1060.

[18] In view of this ruling, it is not necessary to consider SkyWest's arguments against the applicability of each of the state and local wage laws on which various plaintiffs have asserted claims.

*      *      *

For a second time, the plaintiffs have failed to adequately plead that they were ever paid under the federal minimum wage over the course of a workweek, foreclosing their Fair Labor Standards Act claims. Their remaining claims rely on various state and local wage laws, but the application of these laws is foreclosed by the Dormant Commerce Clause. The plaintiffs' complaints are therefore dismissed with prejudice.

Dated: November 30, 2017

_____
John J. Tharp, Jr.
United States District Judge